THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERRELL SMITH, Defendant-Appellant.

First District (6th Division)   No. 1—89—2727

Opinion filed February 18, 1994.

1004

Rita A. Fry, Public Defender, of Chicago (Fred Weill, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:
Following a jury trial, defendant, Verrell Smith, was found guilty

of one count of first degree murder and of four counts of attempted murder. Defendant was sentenced to concurrent terms of 40 years for the murder conviction and of 30 years for each of the attempted murder convictions. Defendant challenges his murder conviction and sentence, contending that (1) he was arrested without probable cause, (2) the statement he gave to the police was involuntary, (3) a mistrial should have been declared where the prosecutor discriminated against defendant in the use of peremptory challenges to venire members, (4) he was not proven guilty of first degree murder beyond a reasonable doubt, and (5) the 40-year sentence imposed on the murder conviction was excessive considering his age and potential for rehabilitation. Defendant also asserts that the mittimus should be corrected to reflect that he was convicted of four, rather than six, counts of attempted murder.

The record reflects that defendant was 15 years old when he was charged with two counts of first degree murder and with six counts of attempted first degree murder in connection with a shooting which occurred in the Altgeld Gardens housing project. Although defendant was charged along with four codefendants, Alan Robinson, Raymond Lewis, Marcus Crockett, and Marcus Bruce, his motion for severance was granted, and he was tried separately before a jury.

Prior to trial, defendant filed a motion to quash his arrest, asserting that the police lacked probable cause to arrest him. Defendant also filed a motion to suppress evidence, contending that the statement he gave to the police was not knowingly or voluntarily made. The trial court conducted separate hearings on defendant's pretrial motions. At these hearings, codefendants Crockett and Robinson presented similar motions.

At the hearing on his motion to quash arrest, defendant testified that he was asleep in his home at approximately 4 a.m. on December 6, 1987, when some policemen came into his bedroom and awakened him. Defendant testified that one of the officers put a gun to his head, stating that defendant's brains would be blown out if he moved. After defendant stood up, the officers flipped the beds over and searched the bedroom. They then gave defendant some clothes to put on, handcuffed him, and took him downstairs. Defendant testified that his brother was also brought downstairs in handcuffs. The officers took defendant outside to a squad car which was parked in front of his house. Defendant stated that as they left the house, he noticed that the front door had a dent in it as if it had been kicked. Once outside, defendant recognized three people who were sitting in another squad car. According to defendant, these people were William Cage, Brian Jones, and Jimmy Jenkins, and defendant knew these

three men lived in the Altgeld Gardens housing project. Thereafter, defendant and his brother were taken to the police station. According to defendant, he was not shown an arrest warrant or a search warrant.

Defendant's mother, Minnie Thomas, testified that defendant was asleep when the police came to their home at approximately 4 a.m. on December 6, 1987. Upon hearing someone beating on the door, Ms. Thomas looked through the window and saw some white men. After the men identified themselves as police officers, Ms. Thomas opened the door to the officers. According to Ms. Thomas, the officers entered the house with their guns drawn and asked for defendant. When Ms. Thomas told them that defendant was in bed asleep, the officers went upstairs, and Ms. Thomas followed them. Ms. Thomas testified that upon entering the bedroom, the officers put guns to the defendant's head and told him to get up and to get dressed. They then searched under the mattress, and Ms. Thomas told them to stop and asked whether they had a warrant. According to Ms. Thomas, the officers then went into another bedroom and took her other son, 21-year-old Vernon Smith, out of bed. The officers handcuffed both of Ms. Thomas' sons and took them out of the house to a police car. Ms. Thomas testified that the officers told her that her sons were being taken to the station for questioning about a shooting, but she was not advised as to the rights of her sons. Despite her request, Ms. Thomas was told by the officers that she could not accompany her sons to the police station. Ms. Thomas then got ready and drove to the police station where she stayed until the following morning.

Chicago police detective James Butler testified that he had been assigned to investigate a shooting at the Altgeld Gardens housing project, and after speaking with the beat officers, he learned that the victim, Lamont Reed, had identified the shooter by the name "Spank." Butler also learned that Marcus Bruce was present and had witnessed the shooting. Butler then went to Bruce's home to speak with him and later went to survey the scene of the shooting along with Bruce and his father. At the scene, Butler found six spent .38-caliber casings on the sidewalk. Bruce and his father returned home while Detective Butler continued his investigation.

Thereafter, Butler canvassed the area, including the home of the victim. There, Butler spoke with the victim's brother, who said that the victim had been with three friends earlier that evening. The victim's brother then took Butler to the home of Brian Jones where Jimmy Jenkins and William Cage were also present. Jones, Jenkins, and Cage told the detective that they had been with the victim at a party on block 17 of the housing project. Upon speaking with Jones,

Jenkins, and Cage, Butler learned that as these three left the party with the victim, they were shot at by defendant and by codefendants Bruce, Crockett, and Lewis, also known as "Spank." The weapons used by the defendants were described to Butler. According to this description, defendant had used a handgun to shoot at the victim and his companions. The other weapons described included a rifle fired by Lewis ("Spank"), a 12-gauge shotgun fired by Robinson, a handgun fired by Bruce, and a 12-gauge shotgun fired by Crockett.

Detective Butler testified that he asked for the addresses of the people who were involved in the shooting and was first directed to the home of Raymond Lewis. Cage, Jenkins, and Jones agreed to accompany the officers to the home of Raymond Lewis. There, the officers placed Lewis under arrest and recovered a rifle and bullets. Thereafter, Cage, Jones, and Jenkins directed Butler and his partner to the home of Marcus Crockett. There, the officers placed Crockett under arrest and recovered shotgun shells and .22-caliber bullets. The officers were then directed to the home of Alan Robinson where Robinson was taken into custody. The officers also returned to the home of Marcus Bruce and placed him under arrest. Finally, the officers were directed to the home of defendant.

According to Butler, the officers knocked on the door, identified themselves, and were admitted by defendant's mother. Butler advised defendant's mother that they were there to make an arrest for the shooting that had taken place earlier that night. After defendant's mother said that defendant was in his bedroom, she directed them to that room. The officers placed defendant under arrest and handcuffed him. While defendant got dressed, the officers looked for a gun in his room. Butler advised defendant of his constitutional rights, and defendant stated that he understood those rights. Butler also advised defendant that he could be charged as an adult. According to Butler, defendant's mother was present when defendant was placed under arrest. Butler testified that when he was brought outside, defendant was identified by at least two of the three witnesses as the person who shot at them and at the victim with a handgun. Butler stated that Cage, Jenkins, and Jones said they knew defendant because he was a member of a rival gang. Thereafter, defendant was taken to the police station, and Butler gave defendant's mother a business card with the address and phone number of the station on it. Butler denied that defendant's mother asked if she could accompany her son to the station.

Detective Butler stated that he did not recall any officer drawing his weapon in defendant's home. Butler specifically denied that he or any other officer had kicked on any doors to gain entry into

defendant's home. Butler also denied that he or any other officer had pressed a gun to defendant's head or said that defendant's brains would be blown out if he moved.

The trial court determined that defendant had been sufficiently identified as being armed with a weapon near the location of the shooting and ruled that the police had probable cause to arrest defendant. Accordingly, the court denied defendant's motion to quash arrest.

Defendant also presented a motion to suppress evidence, asserting that the statement he gave the police while at the police station was not knowingly or voluntarily made.

At the hearing on this motion, Aidan O'Connor testified that she was the assistant State's Attorney assigned to the case. O'Connor questioned defendant at 4:30 p.m. in the presence of Detective Butler and youth officer Hartmann. After that 30-minute interview, she spoke to defendant alone. Defendant made no complaints to her regarding his treatment. At 5:20 p.m., O'Connor took a court-reported statement from defendant. At 10 p.m., she had a third conversation with defendant, during which the statement he had given was reviewed by them together.

O'Connor could not remember whether she asked defendant if he had been allowed to sleep. O'Connor did not ask if defendant's mother was at the station, nor did she attempt to ask if his mother wanted to be present for the interview. She did not know if the detectives promised defendant probation or told him that he could go home with his mother if he gave a statement to her.

Detective James Cloonan testified he arrested defendant at about 4 a.m. He said that he left a card with defendant's mother at the time of the arrest. He explained the charges to her and said that she could go to the station. Cloonan testified that none of the defendant's parents appeared at the station. Cloonan first interviewed defendant at about 5:30 a.m. He read defendant his constitutional rights and told him he could be tried as an adult. No youth officer was present during the interview because none was available until 8 a.m. Cloonan stated that defendant slept at various times after his arrest.

James Walsh testified that he was the youth officer who sat in on the statement given by defendant to the assistant State's Attorney. Walsh testified that there were 30 youth officers who worked that area. He stated that the youth officers worked around the clock, being assigned to each and every watch. Walsh testified that it was policy for a youth officer to be present whenever a juvenile was interrogated.

Walsh stated he was told by Hartmann and Cloonan that all the

defendants' parents had been contacted but that none came into the station. He said he never went to see for himself if any of the parents were there. Nor did Walsh explain to the defendants that he was there on their behalf. Walsh said he did not attempt to contact defendant's parents and that he had no conversation at all with defendant.

Michael Hartmann testified that he was a youth officer who worked the shift from 8 a.m. to 4 p.m. He testified that there were youth officers on duty during the shift before his and that a youth officer was to be present at all interviews with a juvenile. The detectives on the case had informed Hartmann that they had contacted all of the parents involved but that none came to the station. Hartmann did not attempt to contact defendant's parents.

Detective Butler testified that, prior to the taking of defendant's statement, he had no conversation with defendant. Butler denied ever telling defendant he could go home with his mother if he talked, and he denied speaking with defendant's mother at the police station. Butler stated that defendant was not offered anything to eat after 8 a.m.

Minnie Thomas testified that, after seeing two of her sons arrested at home at about 4 a.m., she went with her sister and friend to the police station. She went to the desk and told the sergeant that her sons were there. She asked to go upstairs to see them. The sergeant called upstairs but she was not allowed to see her sons.

Ms. Thomas testified that she stayed at the station until about 3:30 or 4 p.m. At that time, she went home for about 20 minutes before returning to the station. She then left the station again at about 7:30 p.m., when she was told defendant was being taken to the Audy Home. Vernon was released the next morning. During the time she was there, Ms. Thomas asked to see her son about four times. She asked the desk sergeant a couple of times and asked Detective Butler twice to see her son. Ms. Thomas said there were at least 30 people at the station on behalf of the five juveniles arrested, including defendant's father.

Vashan Kyles testified that she was at the home of her friend, Minnie Thomas, on December 6, 1987, when at 4 a.m., police came into the home. Those policemen opened the back door, allowing others in, and then went upstairs. They came back down with defendant and his brother Vernon. Kyles testified that Ms. Thomas asked where they were being taken and why. Ms. Thomas also asked if she could go with them but was told that she could not. Ms. Kyles accompanied Ms. Thomas to the local station, where she stayed until 9 or 10 a.m. When they arrived at the station, 12 or 13 people (relatives of the

codefendants) were already there. She stated that during the time she was there, Ms. Thomas went to the desk four or five times to request to see her son and was refused each time.

Latressa Thomas, defendant's aunt, testified that she was at her sister's home when the police came into the house, went upstairs, and pulled defendant out of bed. She saw the police then go get defendant's brother Vernon. After Minnie Thomas was told she could not accompany her sons to the station, they put their coats on and went to the station. Defendant's aunt testified further that she stayed at the station until 8 or 9 a.m. She stated that her sister asked at the desk four or five times to see her son. Minnie Thomas also asked Detective Butler, who was called down by the officer at the desk, if she could see her son. All requests were refused. Ms. Thomas said that 15 to 20 people were there at the station on behalf of the codefendants.

Defendant testified he was 15 years old when he was arrested for first degree murder on December 6, 1987. He was asleep in his room at 4 a.m. when the police put a gun to his head and arrested him. Defendant said that when he arrived at the police station he was placed in a room on a bench and handcuffed to the wall. Detective Butler left and another detective questioned him. He was told his rights, but he understood them to mean if he "disrespected" the detective, the judge would be told, and it would be used against him. Defendant asked if his mother was at the station, and, if so, could she come up. The detective told him that she was not there. Defendant was questioned by the detective for 20 or 30 minutes. About $1^1/_2$ hours later, Butler came in and asked defendant where was the gun. Butler told defendant that his friends said he had shot someone.

Defendant testified that until that time, he had said nothing. Defendant told Butler that he did not have a gun and that he did not shoot anyone. According to defendant, Butler grabbed him by his shirt, said "you got the gun, your friends telling me you got the gun," and shoved defendant back against the wall. Defendant said he did not have a gun. Butler then told defendant he would give him a few minutes to think and that he would be back. Defendant testified that more than an hour passed before a short detective came in and asked defendant to tell his story again. Defendant did so, and the detective indicated that his story had changed. Defendant denied this.

About 30 to 60 minutes after the short detective left, Detective Butler came back into the room and detached defendant's handcuffs from the wall. He was taken to another room and told a lady was coming to ask him questions. Butler told defendant that everybody was saying he had a gun and shot the victim. Butler said defendant's

mother was downstairs waiting for him and, if he just said he accidentally shot the guy, he could go home with her. Butler told defendant that he had a friend who got five years' probation for an accidental shooting and that he would try to get defendant the same in juvenile court. Defendant was warned not to mention he was told what to say or that any promises were made because he would not get the probation.

Defendant testified that no one told him that the shooting victim had died until the assistant State's Attorney did so while taking his statement. Defendant stated that since the woman was a lawyer working with the police, he believed she would help him get probation if he did as Butler told him. In accordance with Butler's instruction, defendant said that he shot in the air and that he may have accidentally hit someone. Defendant testified that he gave this statement because he thought he would then be able to go home.

When asked about the youth officer who was present during the taking of his statement, defendant said he assumed he was just a policeman. The youth officer had not said anything to him. Defendant testified that he did not know what the word "waive" meant and that he was failing his high school English course. He testified that he did not understand his constitutional rights or that what he said would be used against him. Defendant testified that he would not have given the statement if he knew it would be used against him. Defendant testified further that he did not get any sleep from the time he got to the station until after he had given a signed statement. From the time of his arrest to the time he gave the court-reported statement at 5:30 p.m., defendant was fed once at 8 a.m. He was interrogated about four times prior to the assistant State's Attorney's arrival at 4:30 p.m. From the time of his arrest to the time he signed the statement, no one told defendant that he could have had a free lawyer.

The trial court denied the motion to suppress the statement given by defendant, finding that the statement had been given voluntarily and that defendant had been advised of his constitutional rights. In reaching this conclusion, the trial judge stated that he did not believe the allegation that Detective Butler had made any threats or promises to defendant. The judge stated that although he believed that defendant's mother had been kept from seeing her son, he did not believe that defendant's statement had been coerced.

During *voir dire* and the selection of the jury, defendant objected to the prosecutor's use of peremptory challenges to exclude certain individuals from the panel of potential jurors, claiming that the prosecutor was purposely attempting to exclude African-Americans

from the jury. Specifically, the defendant complained of the exclusion of Yvonne Howard and Annie Delrio, both of whom were African-American. The trial judge stated that he did not believe that a *prima facie* showing of purposeful discrimination had been made but, nonetheless, asked the prosecutor to provide reasons for the use of the challenges. The prosecutor stated that Ms. Howard was excused because he did not believe that she would give the State a fair chance in light of the fact that her brother had been convicted of stealing a car and had received probation. The prosecutor indicated that Ms. Delrio was excused because she lived on the south side of the city where the shooting occurred and had a daughter who was the same age as the defendant at the time of the arrest. The prosecutor stated that he believed Ms. Delrio would feel sympathy for the defendant and for his mother, who would be called to testify along with other defense witnesses who were also mothers. Upon hearing the explanations offered by the prosecutor, the trial court stated "[v]ery good. You have made your record" and resumed questioning of potential jurors. Defense counsel did not comment upon the statements of either the prosecutor or the trial judge, and he did not specifically move for a mistrial at any time before or after the court heard the explanations.

At trial, Steven Shoup testified that he was a Chicago police officer assigned to an investigation of a shooting on the night of December 5, 1987. After arriving at the scene, Shoup talked with the victim, Lamont Reed, who was already in the ambulance. The victim told him that "Spank" shot him and that he was from "Block 17."

Joseph Mayweathers, a member of the Black Gangster Disciples, testified that he was with other gang members outside a party on block 17 in Altgeld Gardens when he saw some people with guns. He recognized defendant, Marcus Crockett, Alan Robinson, and Spank as rival gang members and saw that Robinson and Spank had weapons. Mayweathers testified that he later saw defendant shooting a handgun about five or six times, and Mayweathers heard the bullets ricochet off of a wall. Mayweathers stated that he did not know who had shot the victim.

William Cage testified that after he heard "booms," he saw Marcus Crockett, Raymond Lewis, and Alan Robinson. He stated that Lewis and Crockett had weapons and that they started shooting. Later Cage saw defendant shooting a handgun about five or six times. Though he had been with the victim at the time he first heard shots, he did not personally know what happened to the victim because they had split up.

Cage stated that the police picked him up from his house along

with Brian Jones and Jimmy Jenkins. When the officers asked if they knew "Spank," they directed the police to the home of Raymond Lewis. After leaving Lewis' house, the officers went to the homes of Robinson, Crockett, Bruce, and defendant. Cage stated that he did not identify the defendant when the police brought him out of his house.

Detective Butler testified that at about 4 a.m. on December 6, 1987, he and his partner, Detective Cloonan, went to defendant's house. Another detective was stationed at the back door and another remained in the squad car. After Butler knocked on the front door, it was opened by a woman. Butler then identified himself and asked to speak with defendant. Defendant's mother let the officers in and directed them upstairs to defendant's bedroom. Defendant was then placed under arrest and advised of his rights. According to Butler, defendant's mother was present at this time along with Detective Cloonan and several other people. Defendant did not make any statement at that time and Butler did not ask him to do so. Butler stated that defendant was not advised of his rights after his arrest in the bedroom. Butler denied that any other person was arrested at defendant's home. During his investigation, Butler recovered a .38-caliber handgun which was found in the apartment of Antonio McKinney. There was no attempt to recover any fingerprints from the gun.

Detective Cloonan testified that he was one of the officers that arrested defendant in his bedroom. When they arrived at the station, Cloonan advised defendant of his rights and interviewed defendant at 5:30 a.m. No youth officer was present for this interview, and Cloonan did not attempt to contact defendant's mother. After the initial interview, neither Cloonan nor Butler claimed that defendant was lying.

Richard Fournier, a firearm's examiner, testified that although the bullet that was recovered from the victim's body was a .38 caliber, he could not conclusively determine that it had been fired from the .38-caliber gun which was recovered by the police.

Aidan O'Connor, an assistant State's Attorney, testified that she was assigned to the case at 10 a.m. on December 6, 1987. At about 4:30 p.m., after advising defendant of his constitutional rights, she had a conversation with him. O'Connor stated that she had a second conversation with defendant at 5:20 p.m. and a third at 10 p.m.

O'Connor then published to the jury the statement that defendant had given to her. According to this statement, defendant went with Marcus, "Spank," and "Top Cat," fellow members of the Vice Lords gang, to the home of Marcus Crockett to get some guns after

an argument with several members of the Disciples gang. Defendant described the weapons as a .22-caliber rifle, a 12-gauge shotgun, and a .38-caliber gun. They then went to a store to purchase bullets for the weapons so that they could shoot at the Disciples. Thereafter, he went to the Altgeld Gardens housing project along with Robinson, Crockett, Bruce, Lewis, and "Sinbad." There, they saw some Disciples walking, and Lewis shot the 12-gauge shotgun. At that time, defendant was not carrying a gun. The .38-caliber handgun was then given to him, and he fired it once before giving the gun to "Sinbad," who shot the remaining five bullets. Defendant said he had shot the .38-caliber gun six times on another block. Defendant's friends told him that he had hit the victim, who had been running. Defendant said that when the gun went off, he was trying to shoot in the air and not at the victim. Defendant then hid the gun.

After defendant's statement was read to the jury, O'Connor testified that there were some differences between the oral interview she had with defendant and the court-reported statement that he subsequently signed. At the oral interview, defendant did not say that the shooting was accidental or that he tried to shoot into the air.

The parties stipulated that if called as a witness, Dr. Edmond Donaghue would testify that he had performed the post-mortem examination of the victim, Lamont Reed, and based upon that examination, he determined that the victim died as a result of a single gunshot wound to the back which was not fired from close range.

Testifying for the defense, Minnie Thomas, defendant's mother, stated that she arrived home at about 9:30 p.m. on the night of December 5, 1987, and defendant was already there. Ms. Thomas stated that defendant remained in the house until 4 a.m. when the police came into her home, went upstairs and placed defendant under arrest. According to Ms. Thomas, defendant was awakened when an officer placed a gun to defendant's head while he was sleeping in his bed. Defendant was then made to dress and was put in handcuffs. Another officer went into another bedroom where her other son, Vernon, was awakened and handcuffed. Both of her sons were taken from her home and put into a squad car. Ms. Thomas went to the police station along with her sister and a friend, but she was not allowed to see her sons.

Latressa Thomas, Minnie's sister, and Vashan Kyles, Minnie's friend, each testified that they were with Minnie Thomas in her home on the night of December 5, 1987. Both women testified to substantially the same facts as those presented by Ms. Thomas.

Vernon and Virgil Smith, defendant's brothers, both testified as to the arrests of defendant and Vernon at 4 a.m. on December 6,

1987. Vernon testified that he was awakened, placed under arrest, and handcuffed while he was in his bedroom. Vernon stated that he was never advised of his constitutional rights.

Defendant testified on his own behalf, and the testimony he gave at trial was essentially the same as that presented at the hearings on his pretrial motions to quash arrest and to suppress evidence.

On rebuttal, the State called Detective Butler, who denied that he had his gun drawn at the time of defendant's arrest. Butler also denied that he saw Ms. Thomas at the police station, that he told defendant to say that the shooting had been an accident, or that he told defendant he could go home with his mother if he signed the written statement.

James Walsh testified on rebuttal that defendant seemed to understand what was said to him by the assistant State's Attorney. Walsh explained that the police guidelines require a youth officer to be present for interviews with minors, and when a minor is taken into custody, he should be brought to a youth officer. Walsh stated that he did not see defendant until 5:30 p.m. on December 6, 1987, and he never spoke privately with defendant.

Upon consideration of the evidence, the jury returned verdicts of guilty of first degree murder and of guilty on four counts of attempted murder. Defendant was found not guilty on two counts of attempted murder. After hearing evidence in aggravation and in mitigation, the trial court sentenced defendant to concurrent terms of 40 years for first degree murder and of 30 years for each of the four attempted murder convictions.

Defendant initially contends that the trial court erred in denying his motion to quash arrest and in refusing to suppress the statement obtained after his arrest. In support of this contention, defendant asserts that the police lacked probable cause to arrest him, that there were no exigent circumstances or consent to justify the warrantless entry into his home, and that the giving of his statement was not sufficiently attenuated from his illegal arrest to make it admissible.

In ruling on a motion to quash an arrest, it is within the province of the trial court to determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Stoica* (1987), 163 Ill. App. 3d 660, 669, 516 N.E.2d 909.) A trial court's finding of probable cause will not be overturned unless it is manifestly erroneous. (*People v. Evans* (1988), 125 Ill. 2d 50, 71, 530 N.E.2d 1360.) Where a trial court does not expressly state which testimony it found to be credible, the reviewing court must presume the trial court credited only the testimony which supported its ruling. *People v. Winters* (1983), 97 Ill.

2d 151, 158, 454 N.E.2d 299; *People v. Graham* (1991), 214 Ill. App. 3d 798, 805, 573 N.E.2d 1346.

Whether probable cause exists in a particular case is determined from the totality of the circumstances and facts known. (*Illinois v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332; *People v. Tisler* (1984), 103 Ill. 2d 226, 245, 469 N.E.2d 147.) Probable cause to arrest exists if a police officer has knowledge of facts which would lead a reasonable person to believe that a crime has been committed and that it was committed by the defendant. (*People v. Neal* (1985), 111 Ill. 2d 180, 193, 489 N.E.2d 845.) An arrest cannot be made merely on the officer's suspicion that the individual may have committed the offense, but evidence sufficient to establish guilt beyond a reasonable doubt is not required. (*People v. Moody* (1983), 94 Ill. 2d 1, 7, 445 N.E.2d 275.) In determining whether an officer had probable cause to arrest, the officer's factual knowledge based upon previous law-enforcement experience is relevant (*Tisler*, 103 Ill. 2d at 237), and probable cause may be founded upon evidence which would not be admissible at trial (*People v. Blitz* (1977), 68 Ill. 2d 287, 292, 369 N.E.2d 1238, *cert. denied* (1978), 435 U.S. 974, 56 L. Ed. 2d 68, 98 S. Ct. 1622). An arresting officer may rely on information supplied by an informant in determining whether probable cause exists if the information, taken in its entirety and interpreted by factual and practical commonsense considerations, would lead a reasonable and prudent person to believe that the person arrested committed an offense. (*People v. Adams* (1989), 131 Ill. 2d 387, 396-97, 546 N.E.2d 561.) An arresting officer may rely upon information supplied by an informant if the reliability of the informant has been established, and corroboration of details of the informant's tip support the veracity and reliability of that informant. *People v. Chambers* (1990), 200 Ill. App. 3d 538, 548, 558 N.E.2d 274.

Information leading to the arrest of the defendant has been considered reliable where that information was supplied by the victim of the crime or an eyewitness to it. *People v. Starks* (1989), 190 Ill. App. 3d 503, 510, 546 N.E.2d 71; *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 874-75, 463 N.E.2d 864; *People v. Duncan* (1982), 104 Ill. App. 3d 701, 707-08, 432 N.E.2d 1328; *People v. Garcia* (1981), 94 Ill. App. 3d 940, 945, 419 N.E.2d 542.

■ In the instant case, the trial court denied defendant's motion to quash arrest. The court apparently found credible the testimony of police detectives Butler and Cloonan and determined that the officers had probable cause for defendant's arrest. In entering this ruling, the trial judge recited the facts which he found relevant in making the determination of probable cause. Specifically, the trial court noted

that the officers knew that the victim had been shot and subsequently died of the gunshot wound. The police had information from three witnesses (Cage, Jones, and Jenkins) who, absent evidence to the contrary, must be presumed reliable. The witnesses, who said they had known the defendant for several years, informed the officers that he was at or near the location of the shooting with a weapon and then took the police to defendant's home.

In addition, the record reveals that the witnesses also identified the codefendants and described the weapons which had been used in the shooting incident. Before going to defendant's house, the witnesses took the officers to the homes of three of the codefendants where the officers recovered certain weapons and ammunition which had been particularly described by the witnesses. The officers learned from the three witnesses that defendant had fired a handgun, and Detective Butler and his partner had recovered six spent .38-caliber casings from the scene of the shooting.

This evidence indicates that when they arrived at defendant's home, the police officers had knowledge of sufficient facts which would lead a reasonable person to believe that defendant had participated and was responsible or accountable for the shooting of Lamont Reed. Consequently, the trial court correctly determined that the officers had probable cause for defendant's arrest.

Defendant also contends that the court erred in denying his motion to quash arrest where the State failed to establish valid consent or exigent circumstances to justify the warrantless entry into defendant's home.

Generally, a nonconsensual and warrantless entry into the home of an accused in order to make an arrest is impermissible. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) A warrantless arrest of an accused in his home may, however, be justified where the officers have obtained valid consent to enter the home. (*People v. Henderson* (1990), 142 Ill. 2d 258, 298-99, 568 N.E.2d 1234; *People v. Bean* (1981), 84 Ill. 2d 64, 69, 417 N.E.2d 608.) Whether valid consent to enter was voluntarily given depends upon whether, under the circumstances presented, the police officers could reasonably have believed that they had been given consent to enter. (*Henderson*, 142 Ill. 2d at 299.) The determination of valid consent is to be made from the totality of the circumstances and will not be set aside unless it is clearly erroneous. *People v. Chavez* (1992), 228 Ill. App. 3d 54, 66-67, 592 N.E.2d 69.

■ At the hearing on defendant's motion to quash, Detective Butler testified that defendant's mother, Minnie Thomas, allowed him and his partner, Detective Cloonan, into the house after they

knocked on the door and identified themselves. Butler testified further that Ms. Thomas led them up to the room in which defendant was sleeping after they informed her of their purpose. This evidence indicates that the officers had a reasonable belief that they had been given consent to enter defendant's home. Although Ms. Thomas denied that she had given the detectives permission to enter, the trial judge was obligated to assess the credibility and weight of the testimony and to resolve any conflicts therein. (*People v. Clay* (1973), 55 Ill. 2d 501, 504, 304 N.E.2d 280.) In denying the motion to quash, the judge apparently found the testimony of the officers credible and concluded that defendant's mother voluntarily permitted the officers to enter the house. Based upon the evidence before the court, it does not appear that this conclusion was manifestly erroneous. *Evans*, 125 Ill. 2d at 71.

Moreover, the officers' warrantless entry into defendant's home can be justified by exigent circumstances. (See *Payton*, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382.) Several factors have been identified as being relevant to the question of whether exigent circumstances justify the warrantless entry into a home by police, including (1) a grave offense is involved, particularly a crime of violence, (2) the offense had been committed recently, (3) there was no deliberate or unjustified delay by the police during which time a warrant could have been obtained, (4) the suspect is reasonably believed to be armed, (5) there exists a clear showing of probable cause, (6) there is strong reason to believe that the suspect is on the premises, (7) there is a likelihood the suspect will escape if not swiftly apprehended, (8) the police entry, though nonconsensual, is made peaceably, and (9) the defendant had been clearly identified as the assailant. *People v. Yates* (1983), 98 Ill. 2d 502, 515, 456 N.E.2d 1369; *People v. Abney* (1980), 81 Ill. 2d 159, 169-72, 407 N.E.2d 543.

In the case at bar, examination of these factors indicates that exigent circumstances justified the officers' warrantless entry into defendant's home. Specifically, the officers were investigating a murder, which is certainly a grave offense and a crime of violence. In addition, the offense had been committed earlier that same night, and the officers proceeded immediately to the defendant's home from the homes of the codefendants. Based upon the information received from Cage, Jones, and Jenkins, the officers had reason to believe that the defendant was armed with a handgun. The information obtained during the investigation established probable cause for the officers to believe that defendant was responsible for the shooting of the victim. The officers denied that they forced their way into the house and testified that they entered peaceably with the permission of

defendant's mother who then directed them to the room in which defendant was sleeping. Cage, Jones, and Jenkins identified defendant by name and led the officers directly to his house. In light of this evidence, it appears that the warrantless entry into defendant's home was justified by exigent circumstances.

We need not address defendant's argument that the statement obtained by the police at the station was inadmissible because it was the result of an illegal arrest. Based upon our determination that defendant's arrest was proper, we hold that the trial court did not err in admitting defendant's statement.

Defendant next contends that the court erred in denying the motion to suppress his statement where the State failed to establish that the statement was knowingly, intelligently, and voluntarily made.

The standard of review on a motion to suppress is whether the trial court's ruling was manifestly erroneous. *People v. Galvin* (1989), 127 Ill. 2d 153, 162, 535 N.E.2d 837; *People v. Hoskins* (1984), 101 Ill. 2d 209, 212, 461 N.E.2d 941.

The determination of whether a statement was given freely must be based upon the facts and circumstances of each case, and no single fact is dispositive. (*Rawlings v. Kentucky* (1980), 448 U.S. 98, 107, 65 L. Ed. 2d 633, 643, 100 S. Ct. 2556, 2562.) The pivotal factors to be considered include whether the accused was advised of his constitutional rights, the presence of intervening circumstances, the temporal proximity of the arrest and the statement, and the purpose and flagrancy of the official misconduct involved in the allegedly illegal detention. (*Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 426-27, 95 S. Ct. 2254, 2261-62; *People v. Bracy* (1986), 152 Ill. App. 3d 566, 571, 504 N.E.2d 764.) Of these factors, temporal proximity is the least determinative factor. (*People v. Malloy* (1982), 104 Ill. App. 3d 605, 607, 432 N.E.2d 1291.) Other factors which are considered relevant include the defendant's age, intelligence, background, experience, mental capacity and education, physical condition at the time of questioning, duration and legality of detention, and any physical or mental abuse by police, including the existence of threats or promises. *People v. Hattery* (1989), 183 Ill. App. 3d 785, 821, 539 N.E.2d 368.

The receipt of an incriminating statement by a juvenile in the absence of counsel is a sensitive concern and police must take great care to assure that the admission of the accused was neither coerced nor suggested, nor the product of ignorance of rights, fright, or despair. (*People v. Knox* (1989), 186 Ill. App. 3d 808, 812, 542 N.E.2d 910.) The Juvenile Court Act of 1987 provides that the parent of a

minor taken into custody must be notified and that the minor must be taken, without unnecessary delay, to the nearest juvenile police officer. (Ill. Rev. Stat. 1987, ch. 37, par. 802—6 (now 705 ILCS 405/2—6 (West 1992)).) Yet, the failure to have a parent or guardian present during questioning of a juvenile does not necessarily render statements made at that time inadmissible. *People v. Steptore* (1972), 51 Ill. 2d 208, 214-15, 281 N.E.2d 642; *People v. Zepeda* (1970), 47 Ill. 2d 23, 27-28, 265 N.E.2d 647.

The voluntariness of a statement is to be determined by the trial court, and that determination will not be overturned unless it is manifestly against the weight of the evidence. (*People v. Weger* (1962), 25 Ill. 2d 370, 373-74, 185 N.E.2d 183; *People v. Seawright* (1992), 228 Ill. App. 3d 939, 965, 593 N.E.2d 1003.) Where a trial court fails to expressly state which testimony it found to be credible, the reviewing court must presume the trial court credited only the testimony which supported its ruling. *Winters*, 97 Ill. 2d at 158; *Graham*, 214 Ill. App. 3d at 805.

In the case at bar, Detective Butler testified that he and his partner went to defendant's house after the codefendants had been arrested. The officers arrived at defendant's home at 4 a.m. on December 6, 1987. According to Butler, the officers were admitted into the house by defendant's mother after they knocked on the door, identified themselves, and informed her of their purpose. Butler stated that defendant's mother then directed the officers to the bedroom in which defendant was sleeping. The officers then placed defendant under arrest and handcuffed him. While defendant got dressed, the officers looked for a gun in his room. Butler advised defendant of his constitutional rights, and defendant stated that he understood those rights. Butler also advised defendant that he could be charged as an adult. According to Butler, defendant's mother was present and was aware that defendant had been placed under arrest. Thereafter, defendant was taken to the police station, and Butler gave defendant's mother a business card with the address and phone number of the station on it. Butler denied that defendant's mother asked if she could accompany her son to the station.

Detective Butler stated that he did not recall any officer drawing his weapon in defendant's home. Butler specifically denied that he or any other officer had kicked on any doors to gain entry into defendant's home. Butler also denied that he or any other officer had pressed a gun to defendant's head or said that defendant's brains would be blown out if he moved.

The officers arrived at the police station with defendant at about 5 a.m. on December 6, 1987. Detective James Cloonan testified that

defendant's parents did not appear at the police station after his arrest. Cloonan testified at about 5:30 a.m., he entered the room in which defendant was sitting. According to Cloonan, defendant was not handcuffed at this time. After Cloonan advised defendant of his constitutional rights and stated that he could be tried as an adult, defendant indicated that he understood his rights. Cloonan then interviewed defendant for approximately 30 minutes. Although Cloonan had requested a youth officer, no youth officer was present during the interview because there was not one available at that time. Cloonan stated that defendant slept at various times after his arrest.

Detective Butler denied ever telling defendant he could go home with his mother if he talked, and he denied speaking with defendant's mother at the police station.

At 4:30 p.m., assistant State's Attorney O'Connor spoke with defendant. Detective Butler and youth officer Hartmann were also present.

O'Connor testified that she questioned defendant at 4:30 p.m. in the presence of Detective Butler and youth officer Hartmann. At that time, she introduced herself as a lawyer working with the police and introduced the youth officer as the person who was going to stand in for defendant's parents. O'Connor testified that she advised defendant of his constitutional rights and informed him that he could be tried as an adult. Defendant stated that he understood his rights and wanted to talk to her. After a 30-minute interview during which she questioned defendant about the shooting, O'Connor explained to defendant what a court-reported statement was. Defendant indicated that he understood what a court-reported statement was and that he was willing to make one.

O'Connor then spoke to defendant alone and asked him how he had been treated by the police. O'Connor also asked whether defendant wanted to tell her anything that he felt he could not say before when the detective was in the room. Defendant made no complaints to her regarding his treatment. Defendant told her that he had been offered food and drink and had been permitted to use the bathroom. At 5:20 p.m., O'Connor took a court-reported statement from defendant which was subsequently transcribed. Detective Butler and youth officer Walsh were present while the statement was taken. At 10 p.m., O'Connor had a third conversation with defendant, during which the statement he had given was reviewed by them together. At that time, youth officer Walsh and Detective Ryan were present. O'Connor told defendant to point out any mistakes or corrections. Defendant stated that he could read, write and understand English,

and O'Connor asked him to read the first page of the statement aloud. Defendant read the first page aloud as O'Connor requested, and thereafter, O'Connor read the remainder of the statement aloud. Defendant made certain changes to the statement which he and O'Connor initialed. Defendant also initialed the bottom of each page after determining that the page was correct and signed the last page of the statement after determining that the statement was accurate.

O'Connor asked defendant whether he was in school, and he indicated that he attended school and was in the tenth grade. O'Connor stated that she did not ask defendant what grades he received in school or in his English classes, and she did not learn that defendant received "D's" and "F's" in school and had received an "F" in English.

■ According to the testimony presented by the State, from the time of his arrest at 4 a.m. to the time of his statement at 5:20 p.m., defendant was given food, drink, the opportunity to sleep, and was allowed to use the bathroom. Defendant was not handcuffed in an interview room during this time, and he was not physically abused or coerced into making a statement. Defendant was advised of his constitutional rights on at least three occasions. Defendant indicated that he understood each of his rights, and he agreed to give a court-reported statement after the nature of such a statement had been explained to him and he stated that he understood what a court-reported statement was. No one made any promises to the defendant in exchange for his statement, and defendant never complained of any mistreatment by the police. Although defendant's parents were not present when he gave his statement, youth officer Hartmann was present when defendant made an oral statement to O'Connor, and youth officer Walsh was present when the court-reported statement was taken.

The trial judge, who was charged with the obligation of determining the credibility and weight of the testimony and with resolving conflicts therein (*Clay*, 55 Ill. 2d at 504), apparently believed the testimony of the police officers and of Assistant State's Attorney O'Connor. Although the judge stated that he believed that defendant's mother had been prevented from seeing him, the court concluded that defendant's statement was given voluntarily and was not a product of coercion. Based upon the evidence before the court, it appears that the trial court's conclusion was not manifestly erroneous.

Defendant also claims that his constitutional rights were violated by the prosecutor's exclusion of black jurors from the jury through the use of peremptory challenges.

In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S.

Ct. 1712, the United States Supreme Court held that the equal protection clause of the fourteenth amendment forbids prosecutors from using peremptory challenges to strike potential jurors solely on the basis of their race. To assert a *Batson* claim, a defendant must first establish a *prima facie* case of purposeful discrimination based upon the race of the excluded veniremember. (*Batson v. Kentucky* (1986), 476 U.S. 79, 93-94, 90 L. Ed. 2d 69, 85-86, 106 S. Ct. 1712, 1721; *People v. Mitchell* (1992), 152 Ill. 2d 274, 288, 604 N.E.2d 877.) Once a *prima facie* case has been established, the burden then shifts to the prosecutor to provide race-neutral explanations for striking the veniremember in question. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; *Mitchell*, 152 Ill. 2d at 288.) Defense counsel may then rebut the prosecutor's reasons as being pretextual. (*Mitchell*, 152 Ill. 2d at 288; *People v. Young* (1989), 128 Ill. 2d 1, 27, 538 N.E.2d 453.) Thereafter, the trial court must weigh the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the juror, and any rebuttal presented by defense counsel. (*Mitchell*, 152 Ill. 2d at 288; *People v. Harris* (1989), 129 Ill. 2d 123, 177, 544 N.E.2d 357.) The trial court's determination will only be reversed if it is against the manifest weight of the evidence. (*Mitchell*, 152 Ill. 2d at 289; *People v. McDonald* (1988), 125 Ill. 2d 182, 199, 530 N.E.2d 1351.) Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing is rendered moot, and a court of review need only determine whether the trial court correctly concluded that the explanations offered by the prosecutor were valid or neutral. *Hernandez v. New York* (1991), 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866; *Mitchell*, 152 Ill. 2d at 289.

The explanations offered by the prosecutor "need not rise to the level justifying exercise of a challenge for cause." (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Instead, the prosecutor need only "articulate a neutral explanation related to the particular case to be tried." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) The jury traits which may justify a peremptory challenge include, but are not limited to, courtroom demeanor, employment status and type of job, connections with those who do criminal defense work, social relationships with judges and lawyers, age, status as renter or homeowner, and arrest record. (*People v. Mack* (1989), 128 Ill. 2d 231, 240-43, 538 N.E.2d 1107.) The State's use of these traits to exclude African-Americans will not be considered race neutral if white veniremembers having that same trait are accepted by the

prosecutor and if there is no additional trait to distinguish the white veniremembers who were retained from the African-American veniremembers who were challenged. Yet, it has been noted that there may not be a single criterion which compels a prosecutor to challenge a particular juror, and a trait that might justify exclusion of one juror might be acceptable in a different juror who has other favorable characteristics. *Mack*, 128 Ill. 2d at 239.

■ In the case at bar, 28 members of the venire were questioned, and the trial court excused eight veniremembers. Defense counsel exercised three peremptory challenges, and the prosecution exercised two such challenges. During jury selection, defense counsel objected to the prosecutor's use of peremptory challenges to exclude certain individuals from the panel of potential jurors, claiming that the prosecutor was purposely attempting to exclude African-Americans from the jury. Specifically, the defendant complained of the exclusion of Yvonne Howard and Annie Delrio, both of whom were African-American. The trial judge stated that he did not believe that a *prima facie* showing of purposeful discrimination had been made but, nonetheless, asked the prosecutor to provide reasons for the use of the challenges.

The prosecutor stated that Howard had been excused because she had indicated that her brother had been convicted of stealing a car. The challenge of a juror because a relative has been convicted of a crime has been deemed sufficiently race neutral. (See *People v. Hooper* (1989), 133 Ill. 2d 469, 509, 552 N.E.2d 684.) Delrio was excused because she has a daughter who is about the same age as the defendant, and the prosecutor believed that she would be sympathetic to the mothers who would be called to testify for the defense. The prosecutor stated further that Delrio was excused because of her age and because she lived on the south side of the city, where the crime occurred. Exclusion of a prospective juror because she has a child close in age to that of the defendant has been accepted as a race-neutral reason for a peremptory challenge. (*People v. Lovelady* (1991), 221 Ill. App. 3d 829, 837, 582 N.E.2d 1217; *People v. Baisten* (1990), 203 Ill. App. 3d 64, 79, 560 N.E.2d 1060.) Furthermore, a peremptory challenge based on the prospective juror's residence near that of the defendant, the witnesses, or and crime scene is considered race neutral. *Hooper*, 133 Ill. 2d at 509-10.

Upon consideration of the record before us, we hold that the manifest weight of the evidence supports the trial court's conclusion that the race-neutral explanations offered by the prosecutor were valid. Consequently, the trial court acted properly in refusing to declare a mistrial based upon the prosecutor's use of peremptory challenges.

Defendant next contends that the State failed to prove him guilty of murder beyond a reasonable doubt.

A court of review examining the sufficiency of evidence as to a defendant's guilt must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and a conviction will not be reversed unless the evidence is so improbable that it raises a reasonable doubt of the defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.

Defendant argues that there was no evidence that he shot Lamont Reed and that the State failed to prove that he was guilty of Reed's murder based on the theory of accountability.

To convict a defendant under the theory of accountability, the State must prove beyond a reasonable doubt that he (1) solicited, aided, abetted, agreed or attempted to aid another person in the planning or commission of the offense; (2) did so before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. Ill. Rev. Stat. 1987, ch. 38, par. 5—2 (now 720 ILCS 5/5—2 (West 1992)); *People v. Calvillo* (1988), 170 Ill. App. 3d 1070, 1076, 524 N.E.2d 1054.

Active participation has never been a requirement for the imposition of criminal guilt upon the theory of accountability. (*People v. Reid* (1990), 136 Ill. 2d 27, 61, 554 N.E.2d 174.) Evidence that the defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will support a conviction for an offense committed by another. (*People v. J.H.* (1990), 136 Ill. 2d 1, 17, 554 N.E.2d 961.) Words of agreement are not essential to establish a common purpose to commit a crime, and proof of a common purpose can be drawn from the circumstances surrounding the commission of the unlawful act. (*Reid,* 136 Ill. 2d at 62.) In determining the guilt of an accused under the theory of accountability, the trier of fact may consider the defendant's presence during the commission of the crime, a continued close association with the other offenders after the commission of the crime, the defendant's failure to report the incident, and the defendant's flight from the scene. (*Reid,* 136 Ill. 2d at 62.) It is the function of the trier of fact to determine the credibility

of the witnesses, and a court of review may not reverse the conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the defendant's guilt exists. *Reid*, 136 Ill. 2d at 61.

■ In the case at bar, the statement admitted against defendant indicated that he went to Crockett's home along with codefendants Lewis and Crockett to get some guns after an argument with several members of the Disciples gang. Defendant described the weapons as a .22-caliber rifle, a 12-gauge shotgun, and a .38-caliber gun. They then went to a store to purchase bullets for the weapons so that they could shoot at the Disciples. Thereafter, he went to the Altgeld Gardens housing project along with Robinson, Crockett, Bruce, and Lewis. There, they saw some Disciples walking, and Lewis shot the 12-gauge shotgun. At that time, defendant was not carrying a gun. The .38-caliber handgun was then given to him, and he fired it once before giving the gun to another member of the group who shot the remaining five bullets. Defendant said he had shot the .38-caliber gun six times on another block. Defendant's friends told him that he had hit the victim, who had been running. Defendant said that when the gun went off, he was trying to shoot in the air and not at the victim. Defendant then hid the gun.

Contrary to the claim made by defendant, the facts presented in his statement constituted sufficient evidence to establish defendant's guilt beyond a reasonable doubt on the theory of accountability.

Defendant also asserts that the State failed to prove his guilt beyond a reasonable doubt where he claimed he intended to shoot the gun into the air and where there was no evidence that he intended to shoot the victim.

The intent to murder can be inferred from the act of firing a gun at a person because the natural tendency of such an act is to destroy another's life. (*People v. Gonzales* (1968), 40 Ill. 2d 233, 242, 239 N.E.2d 783; *People v. Manzo* (1989), 183 Ill. App. 3d 552, 560, 539 N.E.2d 237.) Defendant acknowledged in his statement that he and others shot at the victim and the victim's companions. Because the natural tendency of that act was to destroy the victim's life, the jury could have concluded that defendant had the intent to kill the victim.

■ Defendant contends, however, that he shot at the victim accidentally while he was attempting to shoot into the air. This contention is not persuasive. The evidence established that defendant and his fellow gang members deliberately went to the home of Crockett to obtain weapons after an argument with members of a rival gang. They then went to a store to purchase ammunition for the weapons. Thereafter, they went to the Altgeld Gardens housing project, where they shot at some Disciples who were walking down the street. Defendant acknowledged in his statement that he hid the gun

after the shooting. Defendant also acknowledged that he had shot the .38-caliber gun six times, but stated that he had done so on another block. The jury considered defendant's assertion that the shooting was accidental and apparently rejected that explanation as incredible. Based upon the record before us, we hold that evidence adduced at trial was sufficient to prove defendant guilty beyond a reasonable doubt.

Defendant also contends that the sentences imposed for his convictions were excessive when considered in light of his age and potential for rehabilitation.

In considering the propriety of punishment, a court of review must give great weight to the judgment of the trial court. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882; *People v. Bergman* (1984), 121 Ill. App. 3d 100, 110, 458 N.E.2d 1370.) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review. (*Perruquet*, 68 Ill. 2d at 153.) Additionally, the trial judge is normally in a better position to determine the punishment to be imposed than is a court of review. *Perruquet*, 68 Ill. 2d at 154.

A reasoned judgment as to a proper sentence must be based upon the particular facts and circumstances of each individual case. (*Perruquet*, 68 Ill. 2d at 154; *People v. Bolyard* (1975), 61 Ill. 2d 583, 589, 338 N.E.2d 168.) Such a judgment depends upon many factors, including the gravity of the offense and the circumstances of commission, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, age, and criminal history. (*Perruquet*, 68 Ill. 2d at 154.) The sentencing judge is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between protection of society and rehabilitation of the offender. (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541; *Bergman*, 121 Ill. App. 3d at 109.) Yet, the objective of restoring the offender to useful citizenship is to be accorded no greater consideration than that which establishes the seriousness of the offense. *People v. Waud* (1977), 69 Ill. 2d 588, 596, 373 N.E.2d 1, 4; *Bergman*, 121 Ill. App. 3d at 109.

Defendant asserts that his sentences were excessive because he was only 15 years old when the offenses were committed and had great potential for rehabilitation.

■ The record in the instant case reflects that in sentencing defendant, the trial judge stated that he had considered the evidence presented at trial, the information contained in the presentence report, and the factors presented in aggravation and in mitigation, the age and criminal history of the defendant.

Thus, the record indicates that the sentencing judge was fully aware of defendant's age, and the court noted that defendant's age was a mitigating factor. The court was also aware of defendant's prior criminal background, and his potential for rehabilitation. Yet, these considerations had to be balanced against the seriousness of the offenses for which defendant had been convicted. The record establishes that the trial judge properly considered all relevant factors, including the age and rehabilitative potential of the defendant, in making his sentencing decisions. The trial judge sentenced defendant to 40 years for the murder conviction and to 30 years for the attempted murder convictions. These sentences were within the statutory requirements and, considering the nature of the crimes with which defendant was charged, do not reflect an abuse of the trial court's discretion.

■ Finally, defendant argues that the mittimus should be corrected to reflect that he was convicted of only four counts of attempted murder. The State concedes this point and agrees that the mittimus should be corrected in this instance.

For the foregoing reasons, the defendant's convictions and sentences are affirmed, and the cause is remanded with directions to correct the mittimus to reflect that defendant was convicted of four counts of attempted murder rather than six counts.

Affirmed and remanded for correction of mittimus.

EGAN, P.J., and McNAMARA, J., concur.