THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERMAINE JOHNSON, Defendant-Appellant.

First District (2nd Division)   No. 1—99—0210

Opinion filed December 12, 2000.

Rita A. Fry, Public Defender, of Chicago (Andrea Monsees, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Barbara L. Jones, and Julie Line Bailey, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a joint bench trial, defendant Jermaine Johnson and co-defendant Devon Collins were convicted on two counts of armed robbery and six counts of aggravated criminal sexual assault. Codefendant Lendarrow Johnson was acquitted. Defendant and Collins were sentenced to two consecutive terms of 25 and 11 years for the sexual

assaults and a concurrent 25-year term for the armed robbery. The trial court denied defendant's posttrial motion and this appeal follows.

On appeal, defendant argues that: (1) lack of DNA elimination testing rendered the State's expert's opinion unreliable and inadmissible; (2) the trial court erred by preventing defense counsel from cross-examining a witness about defendant's written confession to another crime; (3) the acquittal of one of his two codefendants constitutes a verdict inconsistent with defendant's own convictions, requiring reversal of defendant's conviction; and (4) the trial court abused its sentencing discretion by improperly considering multiple convictions for the same act and victim impact testimony from family members.

## BACKGROUND

Defendant Jermaine Johnson, along with his brother, Lendarrow Johnson, and Devon Collins, was arrested and charged with armed robbery, aggravated vehicular hijacking, and aggravated criminal sexual assault in connection with the August 5, 1994, robbery and rape of the female victim, K.E.

Defendant filed a pretrial motion to suppress two statements: an oral statement he made concerning the instant case and a written statement he made concerning the separate armed robbery of Tyree Johnson which occurred shortly before his arrest. Since both statements were made at the same time to the same officer, the trial court heard the motion to suppress both statements together. The trial court denied the suppression motion.

The following facts were adduced at trial. On August 5, 1994, around 5 a.m., K.E. testified that she parked her car near her home. As she began walking toward her apartment building, three men approached her. The defendant put a gun to her temple and told her to give up her purse. She noticed that the gun bore an insignia that looked like musical notes. Finding no money in her purse, the men pushed her to the ground, went through her pockets and the defendant struck her in the mouth with the gun while the codefendants kicked her.

The men dragged K.E. into a nearby gangway. Defendant ripped off her clothing. While codefendant Collins stood behind K.E., defendant, gun in hand, penetrated K.E. vaginally. After defendant finished, K.E. believed that he left to get her car. Then, the other two codefendants forced K.E. on her hands and knees and assaulted her simultaneously. Collins held a knife to K.E.'s neck and penetrated her orally from the front, while Lendarrow Johnson penetrated her vaginally from behind.

As the codefendants attacked her, she heard the sound of a car horn, and Collins and Lendarrow fled. When she looked up, K.E. saw the three men drive away in her car. She estimated that the entire attack lasted about 25 minutes. She banged on her apartment door and awoke her mother. The police arrived shortly after. K.E. then went to the hospital for treatment.

The next morning around 6 a.m., K.E.'s father, Mr. Jackson, testified that he was driving his wife to work when he saw K.E.'s car being driven through the parking lot of a currency exchange. Jackson followed the car through several neighboring streets. At a stop sign, Jackson saw defendant get out from the passenger side and motion to Jackson that he should turn in a different direction. Jackson then notified the police that he had seen his daughter's car.

Detective Salemme testified that he and his partner, Detective Maher, received a call that same morning and caught up with K.E.'s car. They activated their emergency equipment and followed the car until defendant, who was driving, opened his door and slipped half out of the car, lost control of it, and hit a tree. Devon Collins threw a gun out of the window, which Detective Salemme said K.E. later identified as the weapon used against her.

After a foot chase, the detectives arrested defendant and Collins and took them to the police station. Objects in the trunk of the car were later identified as belonging to K.E. At the station, K.E. viewed a lineup and identified defendant and Collins.

Around 8:30 a.m., Detectives Salemme and Maher questioned defendant. According to Detective Salemme, the defendant orally confessed as follows. Defendant stated that he and the codefendants were looking for someone to rob when they spotted K.E. getting out of her car. In defendant's version, it was Lendarrow who pulled out the gun and demanded money from K.E. When K.E. handed her purse to Collins, he became enraged when there was no money inside. Collins punched K.E. in the face, and Collins and Lendarrow began kicking K.E. while defendant looked around to make sure no one was coming. Then Collins and Lendarrow dragged K.E. into the gangway and raped her while defendant acted as a lookout. According to defendant, Collins threw him the keys and said, "Go get the bitch's car." He got the car, beeped the horn until Collins and Lendarrow joined him in the car and left the scene.

Detective Salemme further testified that the police began looking for Lendarrow Johnson after defendant's arrest. Detectives also went to Collins' address and recovered items belonging to K.E. from the garbage can. Several weeks after the attack, detectives returned to Collins' address and found Lendarrow Johnson hiding under a bed

and arrested him. K.E. identified Lendarrow as the third attacker. On cross-examination, defense counsel attempted to question Detective Salemme about defendant's written statement concerning the Tyree robbery made around the same time as his oral statement concerning K.E. The trial court prevented counsel from pursuing this line of questioning.

Both parties stipulated that Dr. Scott Altman examined K.E. on the morning after the attack. There was a small amount of white discharge in K.E.'s vaginal vault and a contusion on her lower lip. Dr. Altman asked K.E. whether she had had sexual activity within 72 hours of the assault, and she stated that she had.

The swabs taken during K.E.'s medical examination were subjected to DNA testing. It was further stipulated that Julie Glasner, a DNA analyst, would testify that the seminal fraction recovered on K.E.'s vaginal swab was consistent with the DNA profile of the defendant, but not with Collins or Lendarrow. The possibility of a random match with defendant was 1 in 2,000 blacks. Glasner also testified that it was possible for someone to have vaginal intercourse with a woman and for DNA not to be detected. A sampling of sperm was also more difficult to retrieve from oral swabs. Glasner admitted that she did not obtain an elimination standard from the person K.E. had consensual sex with in the 72 hours preceding the attack. She stated that if someone else had sex with K.E. within 72 hours, there would be a 1 in 2,000 possibility of a random match.

The court convicted defendant and Collins on two counts for armed robbery (counts I, II) and six counts for aggravated criminal sexual assault (counts V through VIII, XX, XXVII). Lendarrow was acquitted on all counts. Defendant's posttrial motion was denied. At sentencing, the court heard aggravation testimony that defendant committed robberies just before and after K.E.'s attack. K.E. gave a victim impact statement. Over defendant's objections, K.E.'s sister and father also testified about the attack. In mitigation, several witnesses testified about defendant's Christian activities, status as a good inmate and rejection of his previous gang affiliation.

The court sentenced defendant and Collins on three of the eight counts: 25 years for aggravated criminal sexual assault where defendant acted as principal (count VI); a concurrent term of 25 years for armed robbery (count II); and a consecutive term of 11 years for aggravated criminal sexual assault where Collins acted as principal (count VIII). Defendant appeals. We affirm.

## ANALYSIS

### I. ADMISSIBILITY OF DNA EVIDENCE

Defendant initially argues that the testimony of the State's DNA

expert, Julie Glasner, should not have been admitted. Specifically, defendant contends that Glasner failed to test a blood standard from a man with whom the victim had consensual vaginal intercourse two days prior to her attack. Defendant argues that Glasner's testimony lacked foundation because she failed to consider an essential factor and requires reversal of this case. We disagree.

The decision whether to admit expert testimony lies within the sound discretion of the trial court. *People v. Miller*, 173 Ill. 2d 167, 187, 670 N.E.2d 721 (1996). If the expert's opinion is without proper foundation, that opinion is of no weight and must be disregarded, particularly when the expert fails to consider an essential factor. *People v. Wilhoite*, 228 Ill. App. 3d 12, 21, 592 N.E.2d 48 (1991). Issues concerning the quality of the testing process itself, such as laboratory protocol and the manner in which it was followed, quality control measures, and possible contamination of DNA samples, are matters that go to the weight of the evidence, not its admissibility. *People v. Hickey*, 178 Ill. 2d 256, 279-80, 687 N.E.2d 910 (1997).

Defendant relies upon *Wilhoite* to argue that Glasner's testimony should be disregarded, requiring reversal and remand of this case for a new trial. In *Wilhoite*, the State's expert witness diagnosed defendant's condition as cannabis intoxication, rather than insanity. *Wilhoite*, 228 Ill. App. 3d at 21. The court found the expert's opinion to be foundationally flawed, however, because he failed to consider an essential fact—the amount of marijuana ingested by the defendant. *Wilhoite*, 228 Ill. App. 3d at 21-22. Further, the court noted that the expert's textbook source virtually negated his conclusions and supported those of defendant's experts. *Wilhoite*, 228 Ill. App. 3d at 22. The court held that the manifest weight of the evidence established that it was more likely than not that defendant was insane at the time of the offense. *Wilhoite*, 228 Ill. App. 3d at 28.

*Wilhoite* is distinguishable in two key respects. First, the court in *Wilhoite* found that the expert failed to consider an essential factor, the amount of marijuana ingested by defendant, when he concluded that defendant suffered from cannabis intoxication. Here, while the elimination standard would have been helpful to the trier of fact, it was not necessarily an essential factor because such a standard would not have excluded defendant as K.E.'s attacker. Instead, if K.E.'s consensual partner had similar DNA characteristics as the accused, the possibility of a random match would have been 1 in 2,000 as well. The lack of elimination testing goes to the weight of Glasner's testimony, not its admissibility.

Second, the expert's testimony in *Wilhoite* was the only evidence offered by the State to show that defendant was not insane. Here, the

overwhelming evidence, even without the DNA test, establishes defendant's guilt. K.E. testified that defendant was facing her when he sexually assaulted her; K.E. identified defendant in a lineup two days after the attack; defendant gave an oral statement which, at a minimum, placed him at the scene of the crime; defendant was found in possession of K.E.'s car along with her personal belongings; and codefendant Collins threw a gun out of the car when officers caught them, the same gun that K.E. later identified as the one defendant had held to her head. The trial judge even commented that the DNA evidence was certainly not the "be all and end all," but was "simply considered as further corroboration of the overwhelming evidence of [defendant's] guilt." See *People v. Moore*, 171 Ill. 2d 74, 98, 662 N.E.2d 1215 (1996) (evidence of defendant's guilt was overwhelming without considering DNA evidence). In our view, the trial court did not accord undue weight to the DNA evidence under the circumstances.

## II. SCOPE OF CROSS-EXAMINATION

Next, defendant claims that the trial court erred by refusing to let his counsel cross-examine Detective Salemme concerning the fact that defendant signed a written confession to the armed robbery of Tyree Johnson, which occurred the day after the attack of K.E. According to defendant, evidence that he was willing to sign a written confession to armed robbery creates suspicion about the existence of an oral statement concerning K.E. made on the same day. The State contends that the trial court properly limited cross-examination because evidence of defendant's past crimes was more prejudicial than probative.

■ Generally, the scope of cross-examination is limited to the subject matter of direct examination and matters affecting the credibility of the witness. *People v. Terrell*, 185 Ill. 2d 467, 498, 708 N.E.2d 309 (1998). It is proper to develop all circumstances within the knowledge of the witness that explain, qualify, discredit or destroy that witness's direct testimony. *People v. Enis*, 139 Ill. 2d 264, 295, 564 N.E.2d 1155 (1990). Nevertheless, the trial court's determination that an area of inquiry falls outside the proper scope of cross-examination will not be reversed absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *Terrell*, 185 Ill. 2d at 498. Applying these principles, we hold that the trial court did not abuse its discretion in limiting the scope of cross-examination of Detective Salemme.

■ First, questions concerning the Tyree Johnson robbery were beyond the scope of the direct exam. At oral argument, defense counsel conceded mistake in defendant's brief when it was argued that Detective Salemme testified about the Tyree Johnson robbery on direct exam. Next, defendant relies upon *People v. Melock*, 149 Ill. 2d 423,

599 N.E.2d 941 (1992), to argue that the trial court denied him his right to defend and explain the circumstances of his oral confession. In *Melock*, defendant was falsely told that polygraph evidence indicated that he killed his grandmother. *Melock*, 149 Ill. 2d at 444, 450. Defendant confessed shortly thereafter. *Melock*, 149 Ill. 2d at 444-45. Although polygraph evidence is generally inadmissible, the court held that the polygraph evidence should have been admitted for the limited purpose of determining the credibility and reliability of the confession. *Melock*, 149 Ill. 2d at 465.

In our view, *Melock* is distinguishable from the instant case. Unlike *Melock*, the defendant here does not challenge the manner in which his oral confession was obtained. Instead, defendant simply argues that the fact that he willingly gave a written statement about the Tyree robbery casts doubt as to whether he orally confessed about K.E.'s attack on the same day. However, it is equally likely that defendant agreed only to give a written statement for the less serious charge of armed robbery, deciding not to inculpate himself this way for the more egregious offenses of aggravated criminal sexual assault combined with armed robbery of K.E. The probative value of inquiry concerning the written statement diminishes when it is susceptible to myriad inferences.

Although defendant claims that the trial judge denied defendant his right to impeach Detective Salemme's credibility, the trial court did consider defense counsel's closing argument that the oral statement was a "figment of the detective's imagination" and made the following finding of fact:

> "If the police were going to make up an oral statement I think they could have done a much better job than the oral statement that the officer honestly testified that Jermaine Johnson gave. The reason why it is not better is because it is the truth and Mr. Johnson apparently thought he could take himself out of this vicious activity by blaming his codefendants."

Based on the record, the trial court assessed Detective Salemme's credibility without relying upon prejudicial evidence concerning defendant's crimes in an unrelated matter. Accordingly, the trial court did not abuse its discretion in limiting cross-examination on such details.

## III. INCONSISTENT VERDICTS

Next, defendant contends that, since he and codefendant Lendarrow Johnson were tried on the same facts, their verdicts are inconsistent because the court convicted defendant and acquitted Lendarrow. We disagree.

■ Generally, the failure to convict one defendant does not itself

raise a reasonable doubt as to the guilt of a codefendant. *People v. Perez*, 82 Ill. App. 3d 1007, 1009, 403 N.E.2d 688 (1980). "For a reasonable doubt to be raised in such cases, it must be shown that the evidence against all of the defendants is identical in all respects." *People v. Stock*, 56 Ill. 2d 461, 465, 309 N.E.2d 19 (1974).

■ Here, evidence establishing defendant's guilt was much stronger than that presented against his brother Lendarrow. The trial court found that defendant attacked the victim face-to-face, while Lendarrow allegedly attacked her from behind. K.E. identified the defendant in a lineup the very next day. In contrast, two months and three weeks elapsed before Lendarrow was arrested and identified by K.E. Finally, the police found defendant and Devon Collins driving K.E.'s car with her possessions inside. The trial judge noted that Lendarrow's fingerprints were found on the car's window, but commented that defendant and Lendarrow were relatives and, without further corroboration, she could not conclude that Lendarrow was guilty beyond a reasonable doubt. Thus, due to the stronger evidence against defendant, his subsequent convictions and Lendarrow's acquittal were consistent.

■ Defendant also argues that he is not accountable for the conduct of his codefendants because his oral statement to Detective Salemme "did not show that he caused the others to rape K.E." However, accountability can also be established if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, [defendant] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1998). Acting as a lookout constitutes aiding and abetting in the commission of an offense. *People v. Harris*, 294 Ill. App. 3d 561, 565, 691 N.E.2d 80 (1998).

At a minimum, defendant's oral confession indicated that he acted as a lookout while his codefendants sexually assaulted K.E. Without even considering the other overwhelming evidence against defendant, this statement alone is sufficient to hold defendant accountable for his codefendant's actions. We also disagree with defendant's contention that there is inconsistency between holding defendant accountable for Devon Collins' acts and not accountable for Lendarrow Johnson's acts. It is logical that defendant was not accountable on all counts where Lendarrow was the principal actor because Lendarrow, unlike Collins, was acquitted of all charges. Thus, there is no basis to conclude that there were inconsistent verdicts in the instant case.

## IV. SENTENCING

■ Finally, defendant cites three errors in sentencing. First, defen-

dant contends that the convictions upon which no sentences were imposed should be vacated because they were predicated on the same acts and elements as convictions upon which he was sentenced. On review, we note that the counts upon which defendant was not sentenced (I, V, VII, XX, XXVII) repeat the same elements as the sentenced counts (II, VI, VIII) and merged with them. However, there is no final judgment in a criminal case until the imposition of a sentence, and, in the absence of a final judgment, an appeal cannot be entertained. *People v. Campbell*, 241 Ill. App. 3d 782, 789, 609 N.E.2d 704 (1992). Since no sentences were imposed on the counts at issue, there can be no appeal of defendant's convictions on those counts and they need not be vacated.

•■ Second, defendant argues that the trial court improperly considered victim impact testimony from K.E.'s father and sister during sentencing because they were not "crime victims" under section 3(a) of the Rights of Crime Victims and Witnesses Act (Victim's Act) (725 ILCS 120/3(a) (West 1998)). Where a defendant has been convicted of a violent crime, the victim may address the court regarding the impact that the defendant's criminal conduct had upon the victim. *People v. Willis*, 210 Ill. App. 3d 379, 386, 569 N.E.2d 113 (1991); see 730 ILCS 5/5—4—1(a)(7) (West 1998). K.E.'s father and sister, however, do not fall within the statutory definition of "crime victim" because K.E. was able to testify herself. 725 ILCS 120/3(a) (West 1998).

Nevertheless, the State contends that the family's testimony was appropriate because they were aggravation witnesses. At the postsentencing hearing, the trial court agreed with the State, explaining that it heard these witnesses as aggravation witnesses pursuant to section 5—5—3.2(a)(1), the aggravating factor which provides that defendant's conduct "caused or threatened serious harm." 730 ILCS 5/5—5—3.2(a)(1) (West 1998). See also *People v. Williams*, 223 Ill. App. 3d 692, 701, 585 N.E.2d 1188 (1992) (the trial court may consider the psychological impact of a sexual assault on the victim in determining an appropriate sentence).

Even if there was error in admitting the statements, it was harmless. The Victim's Act provides, "[n]othing in this Act shall create a basis for vacating a conviction or a ground for appellate relief in any criminal case." 725 ILCS 120/9 (West 1998). Moreover, before sentencing the defendant, the court limited the weight given to the family's testimony as follows:

> "[A]lthough the testimony and the statement of the victim and her family members was quite compelling and very emotional, I must look at it in a different light. I must put emotion aside and try to arrive at what I believe is a fair and just sentence."

In our view, in light of the court's comments, the court did not improperly consider the family's testimony during sentencing.

■ Finally, defendant argues that imposition of an aggregate 36-year sentence is excessive. When the sentence chosen by the trial court falls within the statutory range permissible for the pertinent criminal offense for which the defendant has been convicted, the sentence will not be disturbed absent an abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 374-75, 659 N.E.2d 1306 (1995). Also, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed aggravation and mitigation factors differently. *People v. Streit*, 142 Ill. 2d 13, 19, 566 N.E.2d 1351 (1991).

The defendant does not dispute that his sentence was within the appropriate statutory range of 18 to 120 years. Instead, he argues that the trial court did not consider evidence of substantial rehabilitation in mitigation. However, the trial court expressly commended defendant for being a good inmate and rejecting his gang affiliation in prison. The court also commented on his relatively young age, "early 20's," and his potential for rehabilitation to become a productive member of society. The State correctly noted that defendant was eligible for an extended-term sentence of 30 to 60 years for the two aggravated criminal sexual assault convictions. See 730 ILCS 5/5—5—3.2(b) (West 1998). Nonetheless, due to mitigating factors, defendant received far less than the maximum 60-year aggregate (nonextended term) or 120-year aggregate (extended term) for which he was eligible. The court weighed mitigating factors against "the fact that this was a brutal, vicious crime and justice must be served."

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

CAHILL, P.J., and McBRIDE, J., concur.