# Illinois Official Reports

## Appellate Court

---

### *People v. Pearson*, 2018 IL App (1st) 142819

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DeANTHONY PEARSON, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-2819 |
| Filed | September 21, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-19295(02); the Hon. Luciano Panici, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Robert N. Markfield, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Sarah L. Simpson, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Pierce and Griffin concurred in the judgment and opinion. |

¶ 1       Defendant, DeAnthony Pearson, appeals his conviction after a jury trial of attempted first degree murder and attempted armed robbery and his sentence to consecutive terms of 45 years' and 5 years' imprisonment. On appeal, defendant contends (1) he is entitled to a new trial where the State's expert witness stated that the fingerprint identification results were verified by a nontestifying examiner, which constitutes inadmissible hearsay, (2) his conviction for attempted first degree murder should be reduced to aggravated battery with a firearm where the State failed to prove beyond a reasonable doubt that he had an intent to kill, and (3) a new sentencing hearing is required where his aggregate sentence of 50 years' imprisonment amounts to a *de facto* life sentence without consideration of the unique characteristics of his youth and violates the eighth amendment and the proportionate penalties clause of the Illinois Constitution.[1]  For the following reasons, we affirm.

¶ 2                                    JURISDICTION
¶ 3       The trial court sentenced defendant on August 21, 2014. That same day, he filed a notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 and 606 (eff. Feb. 6, 2013), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    BACKGROUND
¶ 5       Defendant, along with two codefendants who are not parties to this appeal, was charged with attempted first degree murder, aggravated battery with a firearm, and attempted armed robbery in connection with an incident that occurred on September 29, 2010. Defendant and his codefendants had separate trials with separate juries. Defendant was 15 years old at the time of the incident.

¶ 6       At defendant's trial, Amir Muhammed Azhar testified that on September 29, 2010, he was working alone at the Marathon gas station at 711 South Halsted Street in Chicago, Illinois. Around 8:15 p.m. that evening, he was at the cash register behind a bulletproof glass window that could only be opened by the cashier. Amir had wiped down both sides of the glass window with Windex, as was routine for whoever was working at the window. No one had touched or leaned on the glass prior to the incident. Beneath the glass was a drawer which Amir used to transfer money and items to customers.

¶ 7       Codefendant Willie Collins entered the store and asked for a single cigarette. Keeping the bulletproof glass window closed, Amir gave him a cigarette through the drawer beneath the glass window. Collins then asked Amir to light the cigarette for him. To do so, Amir opened the bulletproof window. As Collins conversed with Amir, Amir tried to close the window.

---

[1]Defendant also alleged that he is entitled to a discretionary transfer hearing in juvenile court because, during the pendency of his appeal, the legislature raised the age at which a juvenile who commits aggravated battery with a firearm can be transferred to the circuit court from 15 to 16 years old. However, he concedes that *People v. Hunter*, 2017 IL 121306, decided after he filed his opening brief, held that these amendments do not apply retroactively to cases pending on direct appeal.

Collins, however, "kept asking [him] about things which are behind the counter" and Amir kept the window open so he could answer his questions.

¶ 8 At this time, another person entered the store. Amir noted that he had his face covered except for his eyes, and he had a gun in his hand. Amir tried to close the bulletproof window, but the man put his hand on the window so it would not close. While they struggled, the man fired his gun at Amir from 1 to 1½ feet away, striking him in the chest. Amir fell and used his cell phone to call 911. He soon lost consciousness and awoke three days later in the hospital. A surveillance camera recorded the events in the store, and the video was entered into evidence.

¶ 9 The video showed a man coming into the store wearing a red bandana over his head and a black scarf around his face, a purple hooded sweatshirt with a yellow emblem, and green pants. The man also carried a handgun. He pushed Collins aside and pointed his gun at Amir. The man put his left hand on the glass partition to prevent Amir from closing the window, and after struggling with Amir, the man fired at him. Another masked man entered, wearing a navy sweatshirt with a white hood and yellow print with "1947" on the front. The man with the gun put his hand through the open window to bang on the cash register below but the register would not open. Both men fled the store.

¶ 10 Keiara Boyd testified that in September 2010 she was dating and living with codefendant Armoni Allen. Collins lived across the street and would visit their house "[e]very now and then." Keiara also knew defendant. On September 29, 2010, around 8 p.m., defendant, Collins, and Allen were at Allen's residence. Keiara noticed that defendant had a gun and he was "playing with it." When she told him she "didn't play with guns," he stopped pointing it at her. Keiara and Allen then went upstairs, and while they were upstairs, Keiara heard defendant yell for Allen to "come on." Allen then left the room and he, Collins, and defendant left the house together.

¶ 11 Approximately 5 to 10 minutes later, Allen returned alone but was soon joined at the house by defendant and Collins. Everyone was in the same room and defendant, who had the gun in his hands, stated that he shot someone but he did not "know where he shot the man." Allen told defendant and Collins to leave, but defendant left the gun in the room. Keiara noticed it and told Allen to tell defendant to take the gun with him. Defendant returned and took the gun with him. After defendant and Collins left the house, Allen received a call from defendant telling him to look out his back window toward the Marathon gas station and let him know what was happening there. Throughout the night, defendant called and asked Allen to look out the window and tell him what he saw.

¶ 12 Detective Stepich testified that he responded to a shooting at the Marathon gas station on 711 South Halsted on September 29, 2010, around 8:20 p.m. He recovered surveillance video and followed up on a 911 call that was made by a witness. Detective Stepich learned that Collins was the person who made the 911 call, and he was brought in for questioning. Detective Stepich testified that in viewing the footage, he saw that Collins "was in the store, he got the victim to open up the bulletproof glass window. He stuck his hand through the opening a few times, it appeared, and they got—the gentleman wasn't trying to close it, but it seemed like he was trying to keep the window open when the shooter and the other suspect came inside, and he shot, and he fell on the ground." After speaking with Collins, Detective Stepich went to Allen's house and arrested Allen. He then went to defendant's residence and was given permission to search the house. He recovered a pair of shoes that appeared to be the ones worn by one of the offenders in the video and a green cell phone that Collins appeared to be holding

at the gas station store. After a search warrant was issued on Allen's house, Detective Stepich recovered a black Hi-Point 9-millimeter semiautomatic handgun and clothing that appeared to be clothes worn by the shooter when he entered the store.

¶ 13    Detective Deel processed the crime scene, taking fingerprints from the bulletproof glass window and recovering discharged cartridge casings. Detective Deel testified that with his naked eye he could see the fingers and palm impression from a left hand on the window. He saw no other prints on the window. Detective Murtagh received this evidence for processing, and Officer Estock took fingerprints of defendant, Allen, and Collins.

¶ 14    Karen Heard also testified for the State. She stated that she is a forensic scientist specializing in latent print examination, with a bachelor's and master's degree in biology. She also completed a two-year training program with the Illinois State Police in latent print examination. Heard stated that she had been previously qualified as an expert witness 43 times in various state courts as well as in federal court. Defense counsel did not object to the trial court's finding that Heard is "an expert in the latent print examination area."

¶ 15    Heard testified that she examined the prints taken from the window (latent impressions) and compared them to fingerprint standards taken from defendant at the police station. She discussed the characteristics she looks for in her examinations and defined the terms pores, ridges, grooves, creases, and furrows for the jury. Using "magnifiers, one over the latent impression and one over the very first finger entered on the card," Heard made comparisons in this manner with all 10 finger print standards. She compared features "such as any creases, bifurcations, where the ridges will split, ending ridges, curvature, thickness," and "saw that those things were present in the fingerprint standard" of defendant. She determined, within a reasonable degree of scientific certainty, that the fingerprints and palm print found on the bulletproof glass window matched defendant's fingerprint standards. After making her identifications, she gave the lifts and the fingerprint and palm print standards to another examiner, Holly Heitzman. When Heard was asked what she learned from Heitzman's examination, defense counsel objected "to what she learned." The court overruled counsel's objection, and Heard responded that Heitzman "concurred with the verification and the correct markings." Heitzman did not testify at trial. Heard also noted that glass is an ideal surface for lifting prints because it is flat and smooth, and fingerprint residue does not get absorbed into the surface.

¶ 16    Jeffrey Parise, an expert in the field of firearm identification, determined that both the fired cartridge case and discharged cartridge came from the recovered handgun.

¶ 17    Dr. David McElmeel treated Amir at Christ Hospital for multiple gunshot wounds. He stated that when he arrived at the hospital, Amir was not conscious or breathing on his own. A gunshot wound to Amir's upper chest area caused injuries to his right lung, bronchial arteries, and lower rib. There were five injuries to Amir's right lung and the bullet fractured one of his lower ribs. He also suffered a gunshot wound in his right arm. Dr. McElmeel testified that Amir lost a third of his blood supply due to his injuries and had to receive transfusions from an outside hospital as well as from Christ Hospital during the surgery. Dr. McElmeel stated that if Amir had not received the emergency surgery, he would have died.

¶ 18    The State rested, and defendant moved for a directed verdict, which the trial court denied. Testifying for the defense, defendant's grandfather, Michael Pearson, stated that he met with Heard and asked her to explain the procedures and techniques she used in her identifications. She told him that she found two points of comparisons with defendant's prints, but she could

not point out the comparisons on the copy of the prints she showed him. On cross-examination, Pearson stated that the print looked like a photocopy and the picture was blurry.

¶ 19 Leisha Allen, codefendant Allen's mother, testified that she and Keiara visited Allen's lawyer on October 3, 2010. The lawyer asked Keiara what she knew about the incident at the Marathon gas station, and she replied that she did not know anything nor had she heard or seen anything about the incident.

¶ 20 The defense rested. During deliberations, the jury sent back three questions: (1) was there blood splatter on defendant, (2) was there gun residue on defendant, and (3) where is the bullet from Amir Muhammad's body. The court responded that the jury had all the information it needed and to keep deliberating. A few minutes later, the jury returned a verdict of guilty on all counts. Defendant filed a motion for a new trial which the trial court denied.

¶ 21 At the sentencing hearing, defense counsel reminded the court that defendant was 15 years old when the shooting occurred. Defendant's presentence investigation report (PSI) noted that his father worked in the family business and his mother was a caregiver in a nursing home. Defendant lived with his parents and three younger siblings and did not drink. He was not a member of a gang, and he attended his grandfather's church. He also participated in a boxing club sponsored by a ministry group. Defendant's mother "warmly expressed her extreme concern and love and support for her son."

¶ 22 In aggravation, the State presented the testimony of Arturo Robles that Allen gave a handwritten statement about his participation with defendant in the shooting incident. Allen stated that it was defendant's idea to rob the Marathon gas station. Defendant needed a second person to hold open the door for him. The plan was for one person to hold the door open and for the other to put the gun in the clerk's face to rob him. Allen put a wood block in the door to hold it open, and defendant pointed a gun at the clerk. Defendant ordered the clerk to open the cash register and the safe. They netted $150 and some cartons of cigarettes in the robbery. The State also played a videotape of Collins describing the conversations he had with defendant in which defendant admitted to robbing the gas station and receiving money and cigarettes. Robert Lee, a management analyst for the Cook County Juvenile Temporary Detention Center, testified that defendant had 13 violations on his major rule violation report between October 21, 2010, and December 2, 2011. Three violations were in the most serious, "extraordinary circumstances" category, and two of them involved blind-sided attacks. The hearing officers found defendant guilty of the allegations. Lee acknowledged that he did not witness any of these violations.

¶ 23 Before sentencing defendant, the trial court stated that it heard the evidence and must balance the aggravating and mitigating factors under the statute. It noted the mitigating factors as expressed by defendant's family. The court found that from the letters, "defendant comes from a very loving family and a very caring family" and hoped that once he completes his sentence "that love will carry on to him." It also noted defendant's "very minor" criminal history, in which he was "placed on supervision and completed that satisfactory [*sic*]." In aggravation, defendant caused serious bodily harm to a person when he shot Amir in the chest. The court stated that Amir "[a]lmost lost his life" and endured a long period of rehabilitation. The court also noted defendant's conduct while in custody which showed that he "has a problem with authority." It hoped that the sentence would deter others because then, "the sentence will be successful in preventing harm to another individual." The court sentenced defendant to 20 years' imprisonment for attempted first degree murder, and with the

mandatory firearm enhancement, defendant's sentence totaled 45 years, which "must be served at 85 percent." For attempted armed robbery, the trial court sentenced defendant to a consecutive 5 year term to "be served at 50 percent." Defendant filed this timely appeal.

ANALYSIS

I. Heard's Hearsay Testimony

Defendant contends he was denied a fair trial when the trial court admitted Heard's testimony that her fingerprint identification results were verified by Heitzman, who did not testify. Defendant argues that this testimony was hearsay and also violated his right to confront witnesses against him because he was unable to cross-examine Heitzman. Defendant concedes that he did not include this error in a posttrial motion but requests that this court consider the issue as plain error. Under the plain error doctrine, a reviewing court can consider unpreserved error when a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step in a plain error analysis is to determine whether error occurred at all. *Id.*

After Heard concluded that the latent prints taken from the window matched the fingerprint and palm print standards of defendant, she testified that she gave the lifts and standards to another examiner, Holly Heitzman, who "concurred with the verification and the correct markings." Heitzman did not testify at defendant's trial. Therefore, this statement was hearsay in that Heitzman's verification was an out-of-court statement and it was offered to prove the truth of the matter asserted. See *People v. Smith*, 256 Ill. App. 3d 610, 615 (1994). Furthermore, Heard's hearsay testimony was inadmissible because her statement indicated that a nontestifying party identified defendant as the perpetrator of a crime. See *id.*

Our inquiry does not end here, however. The errors alleged by defendant—the improper admission of hearsay testimony and a confrontation clause violation—are not of such a serious character that they challenge the integrity of the judicial process. See *People v. Prince*, 362 Ill. App. 3d 762, 777 (2005) (finding that the erroneous admission of hearsay evidence was subject to harmless error analysis); *People v. Patterson*, 217 Ill. 2d 407, 424-27 (2005) (holding that a confrontation clause violation based on the improper admission of testimony is a trial error subject to harmless error review). As a result, "defendant must meet his burden to show that the error was prejudicial." *Piatkowski*, 225 Ill. 2d at 566. Any error in admitting Heard's testimony is harmless "if there is no reasonable possibility that the verdict would have been different if the hearsay had been excluded." *Prince*, 362 Ill. App. 3d at 777.

Here, even if the trial court had excluded Heard's hearsay testimony, her testimony about the identification process and her own analysis and conclusions was properly admitted. Heard testified as to her education and training and her extensive experience in latent print examination. Defense counsel did not object to her as "an expert in the latent print examination area." Furthermore, Heard provided a sufficient foundation for admitting her testimony by explaining how she reached her conclusions in a manner that allowed for scrutiny of her analysis on cross-examination. See *People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 25. She testified that she examined the latent prints taken from the window and compared them to fingerprint standards taken from defendant at the police station. She noted that glass is an ideal surface for lifting prints because it is flat and smooth and fingerprint residue does not get

absorbed into the surface. She discussed the characteristics she looks for in her examinations and defined the terms pores, ridges, grooves, creases, and furrows for the jury. Using magnifiers, Heard compared features "such as any creases, bifurcations, where the ridges will split, ending ridges, curvature, thickness" and "saw that those things were present in the fingerprint standard" of defendant. She determined, within a reasonable degree of scientific certainty, that the fingerprints and palm print found on the bulletproof glass window matched defendant's standards. Given this admissible testimony, the improper admission of Heard's hearsay testimony was harmless since "there is no reasonable possibility that the verdict would have been different if the hearsay had been excluded." *Prince*, 362 Ill. App. 3d at 777.

¶ 30    Defendant disagrees, arguing that he was prejudiced by the hearsay testimony because "Heard's identification was incomplete and inadequate without Heitzman's findings," and the remaining evidence against him was weak. Specifically, he points out that no forensics evidence tied him to the clothing found by police or to the gun, and Keiara's testimony that she saw defendant with a gun immediately before and after the shooting and heard him make incriminating statements contradicted her statement to codefendant Allen's lawyer that she did not know anything.

¶ 31    However, although no forensics evidence linked defendant to the clothing of the shooter or gun, the surveillance video showed that the shooter put his left hand on the glass window to keep it open before shooting Amir. Heard's admissible testimony established that the latent prints taken from the window matched defendant's print standards. Even if Heard's identification was not verified by a second examiner in accordance with routine procedure, "[i]ssues concerning the quality of the testing process itself, such as laboratory protocol and the manner in which it was followed, [and] quality control measures *** are matters that go to the weight of the evidence, not its admissibility." *People v. Johnson*, 318 Ill. App. 3d 281, 287 (2000). Defendant's counsel had ample opportunity to cross-examine Heard on her methodology and analysis before the jury. It is the function of the jury to assess the credibility of witnesses, the weight to be given their testimony, and to resolve conflicts in the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Likewise, defense counsel cross-examined Keiara on her conflicting testimony, and the jury had the opportunity to assess her credibility and weigh her testimony accordingly. From this evidence, the jury found defendant guilty of attempted murder. We find that defendant was not prejudiced by the erroneous admission of Heard's hearsay testimony.

¶ 32                                    II. Intent to Kill

¶ 33    Defendant next contends that his conviction of attempted first degree murder should be reduced to aggravated battery with a firearm where the State failed to prove his intent to kill. "It is well established that, to obtain a conviction for attempt, the State must prove that the defendant intended to commit a specific offense." *People v. Terrell*, 99 Ill. 2d 427, 431 (1984). Thus, for the State to obtain a conviction for attempted murder, it must prove defendant's intent to kill beyond a reasonable doubt. *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). The State need not show that defendant expressed an intent to kill; rather, intent can be shown by evidence of the surrounding circumstances and the character of the assault. *Id.* Although the firing of a gun, without more, "is generally not sufficient to prove a specific intent to kill," the firing of a gun at someone supports the conclusion that the shooter acted with an intent to kill. *Id.*; see also *People v. Smith*, 258 Ill. App. 3d 1003, 1027 (1994) (finding that

an intent to kill can be inferred from "firing a gun at a person because the natural tendency of such an act is to destroy another's life"). It is the jury's function to determine whether defendant had a specific intent to kill. *Ephraim*, 323 Ill. App. 3d at 1110.

¶ 34        At trial, the State presented evidence that Amir was working behind the glass window when Collins entered the store. He purchased a cigarette and Amir gave it to him through the drawer beneath the glass window. Amir opened the window when Collins asked him to light the cigarette. Defendant then entered the store with his face covered except for his eyes, and he pointed a gun at Amir. Amir tried to close the bulletproof window, but defendant put his left hand on the window so it would not close. They struggled and then defendant fired his gun at Amir from one to one and a half feet away, striking Amir in the chest. Video from a surveillance camera also showed this sequence of events. From this evidence, a reasonable jury could infer that defendant intended to shoot Amir at close range in his effort to keep the window open and gain access to the cash register, " 'the direct and natural tendency of which [was] to destroy another's life.' " See *id.* (quoting *People v. Migliore*, 170 Ill. App. 3d 581, 586 (1988)). As such, the State proved defendant's intent to kill beyond a reasonable doubt and reduction of defendant's conviction to aggravated battery with a firearm is not warranted.

¶ 35        Defendant, however, argues that the evidence does not support a specific intent to kill because he could have killed Amir if he had so desired. He cites to *People v. Mitchell*, 105 Ill. 2d 1 (1984), and *People v. Henry*, 3 Ill. App. 3d 235 (1971), as support.

¶ 36        In *Mitchell*, the defendant had beaten her 16-month-old daughter over the course of two days because she was angry and frustrated with her partner after an argument and because the child was " 'not minding and was getting into cupboards.' " *Mitchell*, 105 Ill. 2d at 7-8. When her daughter lost consciousness, the defendant placed a cool cloth on the child's head and then took her to the hospital where she was treated for her severe injuries. *Id.* at 8. The court found that although the defendant intended to strike the child, the circumstances of the beating and the defendant's explanations were "not consistent with an intent to murder." *Id.* at 10. The court explained that the defendant had "ample opportunity" to do so if she had wanted to kill her child and her actions in applying a cool cloth to her daughter's head and taking her to the hospital did not support such an intent. *Id.*

¶ 37        In *Henry*, the defendant acknowledged that he shot his gun but claimed that he shot in the air and not at the police car. *Henry*, 3 Ill. App. 3d at 237. Although two of the officers in the car stated that the defendant shot at the car, one of these officers acknowledged that the flashes he observed could have come from a gun held at a right angle to the car or pointed straight up in the air. *Id.* at 238-39. The other two officers in the car did not testify that defendant shot at the car. *Id.* at 238. At the time of the shooting, there was violence in the streets and the court noted that the defendant "could have apprehended danger." *Id.* Given these circumstances and the testimony presented at trial, the court found "the State's evidence failed to establish that the shots were fired with an intent to kill." *Id.*

¶ 38        *Mitchell* and *Henry* are inapposite. Unlike the circumstances in *Mitchell*, Amir was shot with a gun, not beaten. The act of firing a gun at a person supports a finding that defendant acted with an intent to kill. *Ephraim*, 323 Ill. App. 3d at 1110. *Henry* is distinguishable because the evidence here unequivocally shows that defendant pointed a gun at Amir and shot him in the chest. From such conduct, it can be inferred that defendant intended to commit "the act of firing a gun at a person" and "the natural tendency of such an act is to destroy another's life." *Smith*, 258 Ill. App. 3d at 1027. The fact that Amir did not die is irrelevant. Amir sustained

severe injuries to his right lung and ribs from the shooting. Dr. McElmeel testified that Amir lost a third of his blood supply and stated that if Amir had not received the emergency surgery, he would have died. Only through the skill of physicians treating Amir, and great fortune that he recovered from his injuries, did defendant escape a charge of murder.

¶ 39   Defendant also argues that the shooting was an impulsive act resulting from his young age and poor judgment, and notes that neither of his codefendants were found accountable on the attempted murder charge. Defendant provides no analysis, nor does he cite to any authority, to support his implication that he can be found guilty of attempted murder only if his codefendants were found guilty of that offense on a theory of accountability. See Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) (requiring appellant's brief to put forth his contentions, "and the reasons therefor, with citation of the authorities and the pages of the record relied on"). Nonetheless, the fact that different juries at separate trials found his codefendants not guilty of the attempted murder charge does not necessarily indicate that the evidence supporting defendant's conviction of attempted murder was insufficient. See *People v. Sims*, 374 Ill. App. 3d 231, 256 (2007) (noting that because triers of fact may differ in resolving factual disputes and credibility determinations, "where codefendants are tried separately before different triers of fact, the acquittal of one codefendant has no bearing on the guilt of [another] codefendant, regardless of the nature of the evidence").

¶ 40   As for defendant's argument that the shooting resulted from his impulsiveness and poor judgment, rather than an intent to kill, we note that the jury was aware of defendant's young age when he committed the offense. It is the jury's responsibility to weigh the evidence and draw reasonable inferences therefrom. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). A reviewing court will not reverse a conviction unless the evidence is so improbable or unsatisfactory " 'as to justify a reasonable doubt of the defendant's guilt.' " *Id.* (quoting *People v. Campbell*, 146 Ill. 2d 363, 375 (1992)). Furthermore, in considering the evidence the jury "is not required to disregard inferences which flow normally" from that evidence, nor must it "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *Id.* As discussed above, the evidence presented at trial supports the jury's finding beyond a reasonable doubt that defendant had an intent to kill.

¶ 41                                III. Sentencing

¶ 42   Defendant's final contention is that his aggregate sentence of 50 years' imprisonment violates the eighth amendment and the proportionate penalties clause of the Illinois Constitution.[2] Defendant argues that his sentence violates the eighth amendment because it is a *de facto* life sentence and was imposed without consideration of the unique characteristics of his youth as required by *Miller v. Alabama*, 567 U.S. 460 (2012), and *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016).

---

[2]Defendant notes that "[i]n light of the 85% service requirement for attempt murder, he is not eligible for parole until November 19, 2048, one month before his 54th birthday." The State also states in its brief that defendant will be eligible for release at age 53. Our calculations, however, indicate that defendant will be 55 years old when he is eligible for release, after taking into account defendant's consecutive sentence of five years' imprisonment for attempted armed robbery to be served at 50%. Whether he will be 53 or 55 years old does not affect our determination. Thus, we consider this issue based on defendant being 55 years old when he is eligible for release.

¶ 43 This issue arises as a result of those recent decisions by the United States Supreme Court regarding the constitutionality of mandatory life sentences imposed upon juvenile defendants. In *Miller*, the Supreme Court determined that "children are constitutionally different from adults for purposes of sentencing" due to their "diminished culpability and greater prospects for reform." *Miller*, 567 U.S. at 471. The court noted that these distinctive characteristics of youth diminish a juvenile's culpability, and therefore diminish the "penological justifications" for imposing life without parole on juvenile defendants. *Id.* at 472. It concluded that a mandatory sentence of life without parole posed "too great a risk of disproportionate punishment" and required that before imposing such a sentence, the sentencing judge consider "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80. In *Montgomery*, the Supreme Court determined that *Miller* "established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth,' " which is a "substantive rule of constitutional law" to be applied retroactively. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734.

¶ 44 *Miller* and *Montgomery*, however, left important issues for courts to address. For example, our supreme court has determined that a sentence of aggregate terms of imprisonment can be considered the same as a mandatory life sentence; therefore, the constitutional limitations placed on juvenile sentencing in *Miller* and *Montgomery* can apply to such terms of imprisonment as well. See *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10 (*per curiam*) (sentencing a juvenile offender to a legislatively mandated sentence of 97 years "is the functional equivalent of life without the possibility of parole" and violates the eighth amendment). This conclusion logically flows from the findings in *Miller* and *Montgomery* that a sentence of a lifetime in prison for a juvenile defendant, without consideration of "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," is unconstitutional. *Miller*, 567 U.S. at 480. In determining the constitutionality of juvenile sentences in this regard, there is no substantive difference between a mandatory aggregate sentence of 97 years in prison, to be served almost in its entirety, and a sentence of mandatory life in prison. In both cases, the juvenile defendant will spend the rest of his life in prison with no possibility of parole in his lifetime.

¶ 45 From this determination stems the thornier issue of what term-of-years sentence can be considered a *de facto* life sentence, the question before us here. Understandably, courts are generally reluctant to make a legal determination of a juvenile's likely lifespan, which would include considerations of societal factors and policy that are best addressed by the legislature. See *People v. Jackson*, 2016 IL App (1st) 143025, ¶ 57; *People v. Evans*, 2017 IL App (1st) 143562, ¶ 15; *People v. Rodriguez*, 2018 IL App (1st) 141379-B, ¶ 74 (finding that appellate courts enter dangerous territory in attempting to determine a *de facto* life sentence "based on actuarial data specific to the defendant, including race, ethnicity, gender, and other social factors bearing on an individual's life expectancy"). In fact, the legislature could bypass this issue by requiring all juvenile offenders to be considered for parole after a term of years that would put the juvenile's age well below the range of life expectancy (*e.g.*, 25 years). *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736. However, since our legislature has not yet enacted such legislation, our courts are left to ascertain whether a juvenile's sentence is a *de facto* life sentence.

¶ 46 This determination is straight-forward where the sentence is so lengthy that no one can question its survivability. See *Reyes*, 2016 IL 119271 (97-year sentence); *People v. Morris*,

2017 IL App (1st) 141117 (100-year sentence); *People v. Nieto*, 2016 IL App (1st) 121604 (78-year sentence). The determination is more problematic where the survivability of a sentence is not readily apparent. For example, this court in *People v. Buffer*, 2017 IL App (1st) 142931, ¶ 62, *appeal allowed*, No. 122327 (Ill. Nov. 22, 2017), determined that a sentence where a juvenile would be discharged at 69 years old was a *de facto* life sentence. However, in *People v. Applewhite*, 2016 IL App (1st) 142330, ¶ 16, this court found that a sentence allowing for release at age 62 was not a *de facto* life sentence. In *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 66-67, this court also found that a juvenile defendant eligible for release when he is 60 years old did not receive a *de facto* life sentence.

¶ 47    Although our supreme court has not determined a precise age of release that would constitute a *de facto* life sentence, it has recently provided some guidance in *Reyes*, where the court applied *Miller* to a "mandatory term-of-years sentence that cannot be served in one lifetime." *Reyes*, 2016 IL 119271, ¶ 9. The defendant in *Reyes*, who was 16 years old when he committed the offense, received a mandatory minimum sentence of 20 years' imprisonment for first degree murder, plus a mandatory 25-year firearm enhancement, and 26 years for each of his two attempted murder convictions consisting of the minimum 6-year sentence for attempted murder plus a 20-year mandatory firearm enhancement. *Id.* ¶ 2. Pursuant to statute, the defendant was required to serve his sentences consecutively; therefore, he "was sentenced to a mandatory minimum aggregate sentence of 97 years' imprisonment" and "required to serve a minimum of 89 years" before being eligible for release. *Id.*

¶ 48    The State conceded, and the court agreed, "that defendant will most certainly not live long enough to ever become eligible for release." *Id.* ¶ 10. Our supreme court reasoned that such a sentence "has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison." *Id.* ¶ 9. The court held that to sentence a juvenile defendant to a mandatory term "that is the functional equivalent of life without the possibility of parole," without consideration of the mitigating factors of youth set forth in *Miller*, "constitutes cruel and unusual punishment in violation of the eighth amendment." *Id.*

¶ 49    In *People v. Hoy*, 2017 IL App (1st) 142596, ¶ 42, the juvenile defendant argued that his sentence of 52 years' imprisonment violated the eighth amendment and the proportionate penalties clause of the Illinois Constitution because it is essentially a sentence of "natural life" in prison without consideration of the principles set forth in *Miller*. The court in *Hoy* looked at *Reyes* and determined that the case extended *Miller* to a mandatory, unsurvivable prison term. Since the defendant in *Hoy* would be released at 68 years old, we found that his sentence was survivable and could not be considered " 'the functional equivalent of life without the possibility of parole.' " *Id.* ¶ 46. We acknowledge that determining whether a sentence is "survivable" can be a treacherous endeavor, and if the legislature does not act, perhaps our supreme court will provide further guidance in the future. We need not take on this issue here, however, because defendant's aggregate sentence of 50 years' imprisonment, where he is eligible for release when he is 55 years old, is objectively survivable. Therefore, pursuant to *Reyes*, it is not a *de facto* life sentence and any failure to consider the factors set forth in *Miller* prior to sentencing did not violate the eighth amendment.

¶ 50    Defendant, however, argues that his sentence is a *de facto* life sentence because even if he survives the term, he would be deprived of a meaningful opportunity to demonstrate his maturity or rehabilitation upon reentering society. He asks this court to follow *Buffer*, which

found that a 50-year sentence imposed on a 16-year-old defendant convicted of first degree murder was a *de facto* life sentence. *Buffer*, 2017 IL App (1st) 142931, ¶ 62. In so holding, the court cited to *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26, which referred to an United States Sentencing Commission preliminary quarterly data report and determined that a person in prison has a life expectancy of about 64 years. *Id.* ¶ 59. Since the defendant's discharge would not occur until he is 69 years old, the court found that he would not have a meaningful opportunity for release. *Id.* ¶ 62. The court in *Buffer* further reasoned that "lesser sentences than life without parole" may also "trigger *Miller*-type protections" because a juvenile who would be released in his late sixties after nearly half a century of incarceration has no meaningful opportunity to demonstrate his maturity or rehabilitation upon reentering society. (Internal quotation marks omitted.) *Id.*

¶ 51    We respectfully decline defendant's invitation. Even if we were to apply *Buffer*'s determination that a prisoner's life expectancy is 64 years, it has no relevance here where defendant will be 55 years old upon his release. Defendant argues, however, that we should adopt *Buffer*'s reasoning that "lesser sentences than life without parole" may also "trigger *Miller*-type protections." (Internal quotation marks omitted.) *Id.* We note that *Miller* and *Montgomery* involved mandatory life sentences, and the Supreme Court did not have occasion to consider whether "lesser sentences than life without parole" can also trigger constitutional protections for juvenile defendants. In neither case did the Court refer to the defendant's quality of life after release as a factor courts must consider. Our supreme court in *Reyes*, equating a *de facto* life sentence with a mandatory, unsurvivable prison term, also did not address whether a juvenile defendant must have an opportunity for a meaningful life after imprisonment. That being said, we do not disagree that this factor could be relevant in determining what constitutes an appropriate juvenile sentence in light of the unique attributes of youth outlined in *Miller*. As we discussed above, these issues are best resolved by the legislature after taking into account societal and policy considerations.

¶ 52    Defendant also argues that his sentence violates the proportionate penalties clause of the Illinois Constitution. To succeed on this claim, defendant must show that his sentence is degrading, cruel, "or so wholly disproportionate to the offense that it shocks the moral sense of the community." *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009). Defendant contends that his sentence shocks moral standards where he "was only 15 years old, his offense was both rash and non-lethal, and the court failed to take into account *** the accompanying qualities of youth" in sentencing him. He primarily relies on *Gipson* as support.

¶ 53    The 15-year-old defendant in *Gipson* was convicted of attempted murder and other offenses and received a cumulative sentence of 52 years' imprisonment. *Gipson*, 2015 IL App (1st) 122451, ¶¶ 1, 4. The juvenile defendant had been falsely accused of murder at the age of seven and hospitalized. *Id.* ¶ 5. In reviewing the defendant's claim that his sentence violated the proportionate penalties clause, the court found that other factors also diminished the justification for his prison term. The record indicated that the incident "resulted from rash decision making" and showed "that as a juvenile with mental illness, defendant was prone to impulsive behavior." *Id.* ¶ 73. The court questioned the defendant's mental health at the time of the offense, noting that his documented "mental health issues were not appropriately addressed." *Id.* ¶ 74. Furthermore, the defendant "personally did relatively minimal damage" where the victim was discharged from the hospital on the same day he received treatment. *Id.* ¶ 73. The defendant in *Gipson* was also sentenced under a sentencing scheme that did not

permit the trial court to give appropriate weight to defendant's youth and mental disorders. *Id.* ¶ 75. Taking these factors into account, the court in *Gipson* determined that although the defendant committed a serious offense, his sentence was "so wholly disproportionate that it shocks the moral sense of the community." *Id.* ¶ 73.

¶ 54    Like the defendant in *Gipson*, defendant here was 15 years old at the time of the offense and he was also convicted of attempted murder. However, the similarity ends there. Defendant here did not have a documented history of serious mental health issues that resulted in rash decision making. The evidence here also indicated that defendant and his codefendants planned the armed robbery. Unlike *Gipson*, defendant's intentional shooting of Amir caused him to suffer near-fatal injuries. The physician who treated Amir testified that he would have died had he not received emergency treatment. In sentencing defendant, the trial court noted the mitigating factors expressed by letters from his family and his activities. However, the trial court also looked at the fact that defendant caused serious bodily harm to Amir by shooting him in the chest. While in custody, defendant had 13 major infractions, which showed he has a problem with authority. The trial court stated that it wanted to deter others because if "the sentence does in fact deter at least one other person, the sentence will be successful in preventing harm to another individual." We find that defendant's sentence does not violate the proportionate penalties clause.

¶ 55    Defendant, however, argues that the court failed to take into account the heightened rehabilitative potential of his youth, citing *People v. Miller*, 202 Ill. 2d 328 (2002) (*Leon Miller*). In *Leon Miller*, the 15-year-old defendant's natural-life sentence resulted from the convergence of three statutes. *Id.* at 340. Although he was convicted on the theory of accountability, he was tried as if he were the adult shooter and then subject to the most severe punishment. *Id.* Our supreme court found that the sentencing court "never consider[ed] the actual facts of the crime, including the defendant's age at the time of the crime or his or her individual level of culpability." *Id.* Therefore, it held that the statutory sentence as applied to the defendant was "particularly harsh and unconstitutionally disproportionate." *Id.* at 341.

¶ 56    *Leon Miller* does not apply here for several reasons. First, the facts of *Leon Miller* are completely distinct from this case, aside from the young ages of the defendants. Second, defendant did not receive a natural-life sentence resulting from the convergence of statutes that did not allow for consideration of his culpability, youth, and rehabilitative potential. Finally, the trial court at sentencing was aware of defendant's age, considered his culpability, and in terms of rehabilitative potential expressed hope that the love and support of defendant's family would "carry on to him" after he completes his sentence. The trial court stated that it considered the mitigating and aggravating factors, and it is not required to give defendant's rehabilitative potential greater weight than the seriousness of the offense. *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005).

¶ 57    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 58    Affirmed.